No. 21-3334

IN THE
UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

| | | |
|---|---|---|
| MCHENRY COUNTY and KANKAKEE COUNTY, | ) ) ) | Appeal from the United States District Court for the Northern District of Illinois, Western |
| Plaintiffs-Appellants, | ) ) | Division |
| v. | ) ) | No. 3:21-cv-50341 |
| KWAME RAOUL, in his official capacity as Attorney General of Illinois, | ) ) ) | |
| Defendant-Appellee. | ) ) ) | The Honorable PHILIP G. REINHARD, Judge Presiding. |

**BRIEF OF DEFENDANT-APPELLEE
ATTORNEY GENERAL KWAME RAOUL**

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

**ALEX HEMMER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5226
Alex.Hemmer@ilag.gov

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendant-Appellee

# TABLE OF CONTENTS

Page

TABLE OF AUTHORITIES ............................................................................... iii

JURISDICTIONAL STATEMENT ..................................................................... 1

ISSUES PRESENTED ........................................................................................ 2

STATEMENT OF THE CASE ............................................................................ 3

    A.    Legal background ................................................................ 3

    B.    Procedural history .............................................................. 6

SUMMARY OF ARGUMENT ............................................................................ 9

ARGUMENT ................................................................................................... 11

I.    The Court Reviews The District Court's Dismissal Of The Complaint De Novo. ................................................................................................. 11

II.    The District Court Correctly Held That Section 15(g) Is Not Preempted By Federal Law. .............................................................................. 12

    A.    Section 15(g) is not preempted under traditional preemption principles. .......................................................................... 12

        1.    Section 15(g) is not expressly preempted. .................... 12

        2.    Section 15(g) is not field-preempted. ............................ 13

        3.    Section 15(g) is not conflict-preempted. ....................... 17

    B.    Section 15(g) is not preempted under *Murphy*. ...................... 22

III.    The District Court Correctly Held That Section 15(g) Does Not Violate Principles Of Federal Intergovernmental Immunity. ........................ 28

    A.    Section 15(g) reflects only the State's own decision not to participate in federal programs. ............................................ 28

    B.    Section 15(g) does not violate intergovernmental immunity principles in any other manner. ............................................. 30

CONCLUSION .................................................................................................... 36

CERTIFICATE OF COMPLIANCE

CERTIFICATE OF SERVICE

# TABLE OF AUTHORITIES

Page(s)

**Cases**

*American Civil Liberties Union of New Jersey, Inc. v. County of Hudson*,
    799 A.2d 629 (N.J. App. Div. 2002) .......................................................... 16

*Arizona v. United States*,
    567 U.S. 387 (2012) ............................................................................. 3, 14

*Armstrong v. Exceptional Child Center, Inc.*,
    575 U.S. 320 (2015) ...................................................................................... 1

*Calderon v. Moyers*,
    558 F. Supp. 19 (N.D. Ill. 1982) ................................................................ 16

*Chamber of Commerce v. Whiting*,
    563 U.S. 582 (2011) .................................................................................... 17

*City & County of San Francisco v. Sessions*,
    349 F. Supp. 3d 924 (N.D. Cal. 2018) ....................................................... 24

*City of Chicago v. Barr*,
    961 F.3d 882 (7th Cir. 2020) ........................................................................ 5

*City of El Cenizo v. Texas*,
    890 F.3d 164 (5th Cir. 2018) ........................................................... 4, 14, 15

*Colorado v. U.S. Dep't of Justice*,
    455 F. Supp. 3d 1034 (D. Colo. 2020) ....................................................... 24

*Committee of Central American Refugees v. INS*,
    795 F.2d 1434 (9th Cir. 1986) .............................................................. 15, 16

*Dalton v. Little Rock Family Planning Services*,
    516 U.S. 474 (1996) (per curiam) .............................................................. 26

*Dawson v. Steager*,
    139 S. Ct. 698 (2019) .................................................................................. 35

*DeCanas v. Bica*,
    424 U.S. 351 (1976) ...................................................................................... 3

*Gandarillas-Zambrana v. BIA*,
  44 F.3d 1251 (4th Cir. 1995) ...................................................................... 16

*GEO Group, Inc. v. Newsom*,
  15 F.4th 919 (9th Cir. 2021)........................................13, 16, 21, 22, 30, 34

*Gomillion v. Lightfoot*,
  364 U.S. 339 (1960)...................................................................................... 27

*Goodyear Atomic Corp. v. Miller*,
  486 U.S. 174 (1988)................................................................................ 30, 32

*Gregory v. Ashcroft*,
  501 U.S. 452 (1991)............................................................................ 20, 21, 26

*Hernandez v. Cook Cnty. Sheriff's Office*,
  634 F.3d 906 (7th Cir. 2011) ...................................................................... 11

*Kansas v. Garcia*,
  140 S. Ct. 791 (2020)................................................................................... 14

*Keller v. City of Fremont*,
  719 F.3d 931 (8th Cir. 2013) ...................................................................... 14

*Klein v. O'Brien*,
  884 F.3d 754 (7th Cir. 2018) ...................................................................... 28

*Kubiak v. City of Chicago*,
  810 F.3d 476 (7th Cir. 2016) ...................................................................... 11

*Lawrence County v. Lead-Deadwood School District*,
  469 U.S. 256 (1985)........................................................................... 24, 25, 26

*Leslie Miller, Inc. v. Arkansas*,
  352 U.S. 187 (1956) (per curiam)........................................................ 30, 32

*Mayo v. United States*,
  319 U.S. 441 (1943)...................................................................................... 30

*Murphy v. NCAA*,
  138 S. Ct. 1461 (2018)......................................................................... *passim*

*Nelson v. Great Lakes Education Loan Services, Inc.*,
  928 F.3d 639 (7th Cir. 2019) ........................................... 12, 13, 14, 15, 17

*Nixon v. Missouri Municipal League*,
    541 U.S. 125 (2004).................................................................20, 21, 27

*Norfolk Southern Railway Co. v. Shanklin*,
    529 U.S. 344 (2000)........................................................................ 26

*North Dakota v. United States*,
    495 U.S. 423 (1990)...........................................28, 31, 32, 33, 34

*Ocean County Board of Commissioners v. Attorney General of New Jersey*,
    8 F.4th 176 (3d Cir. 2021) ....................................................... 11, 24

*Oneok, Inc. v. Learjet, Inc.*,
    575 U.S. 373 (2015)........................................................................ 12

*Oregon v. Trump*,
    406 F. Supp. 3d 940 (D. Or. 2019) ........................................... 24

*Printz v. United States*,
    521 U.S. 898 (1997).......................................................................... 4

*Public Utilities Commission of California v. United States*,
    355 U.S. 534 (1958)................................................................... 30, 32

*Puente Arizona v. Arpaio*,
    821 F.3d 1098 (9th Cir. 2016) ................................................... 14

*Redmond v. Novak*,
    427 N.E.2d 53 (Ill. 1981) ............................................................ 6, 33

*Reynolds v. Sims*,
    377 U.S. 533 (1964)................................................................... 6, 33

*Sanchez-Soriano v. United States*,
    No. 09-cv-500, 2011 WL 6217063 (S.D. Ill. Aug. 2, 2011) ....................................... 16

*Santiago v. Walls*,
    599 F.3d 749 (7th Cir. 2010) ................................................... 11

*Seminole Tribe of Florida v. Florida*,
    517 U.S. 44 (1996)........................................................................ 25

*Trenton v. New Jersey*,
   262 U.S. 182 (1923)..................................................................... 33

*Tweed-New Haven Airport Authority v. Tong*,
   930 F.3d 65 (2d Cir. 2019) ................................................... 11, 27

*United States v. California*,
   921 F.3d 865 (9th Cir. 2019) ..................................... 18, 19, 22, 29

*United States v. City of Arcata*,
   629 F.3d 986 (9th Cir. 2010) ......................................................... 32

*Virginia Uranium, Inc. v. Warren*,
   139 S. Ct. 1894 (2019).................................................................... 18

*Washington v. United States*,
   460 U.S. 536 (1983)........................................................................ 34

## Constitutional Provisions

U.S. Const. art. VI ................................................................................ 1

Ill. Const.
   art. VII, § 6 .................................................................................... 6
   art. VII, § 7 ............................................................................. 6, 33

## Statutes, Regulations, and Rules

8 U.S.C
   § 1103....................................................................................... *passim*
   § 1226................................................................................... 3, 18
   § 1231....................................................................................... *passim*
   § 1357............................................................................................ 3

28 U.S.C.
   § 1291............................................................................................ 1
   § 2107............................................................................................ 1

Cal. Gov't Code § 7282.5 ................................................................... 4

5 ILCS
   805/1............................................................................................. 4
   805/15................................................................................. 5, 6, 31

Ill. Pub. Act No. 102-234..........................................................................................5

Tex. Code Crim. Proc. art. 2.251 ...................................................................4

Fed. R. App. P. 4 .............................................................................................1

**Other Authorities**

Engelbrecht, Cora, *Fewer Immigrants Are Reporting Domestic Abuse; Police Blame Fear Of Deportation*, N.Y. Times (June 3, 2018), https://www.nytimes.com/ 2018/06/03/us/immigrants-houston-domestic-violence.html. ....................................5

Geiger, Kim, Chicago Tribune, *Rauner Signs Immigration, Automatic Voter Registration Bills Into Law* (Aug. 28, 2017), https://www.chicagotribune.com/ politics/ct-bruce-rauner-immigration-voting-met-0829-20170828-story.html .........5

New Jersey Attorney General Law Enforcement Directive No. 2018-6, https://www.nj.gov/oag/newsreleases19/ag-directive-2018-6_v2.pdf ........................4

# JURISDICTIONAL STATEMENT

Plaintiffs-Appellants' jurisdictional statement is not complete and correct. Defendant-Appellee Attorney General Kwame Raoul provides this statement under Circuit Rule 28(b).

Plaintiffs brought this action in the district court against the Attorney General in his official capacity, alleging violations of the Supremacy Clause of the U.S. Constitution. *See* SA6-8; U.S. Const. art. VI, cl. 2; *Armstrong v. Exceptional Child Ctr., Inc.*, 575 U.S. 320, 327 (2015).[1] The district court thus had subject-matter jurisdiction over plaintiffs' action pursuant to 28 U.S.C. § 1331.

On December 6, 2021, the district court granted the Attorney General's motion to dismiss the action under Federal Rule of Civil Procedure 12(b)(6), SA39, thereby disposing of all claims against all parties, and entered a separate judgment on the docket pursuant to Rule 58, Doc. 42. No motion to alter or amend the judgment was filed. Plaintiffs filed a notice of appeal on December 16, 2021, which was within 30 days of the Rule 58 judgment and thus timely. Doc. 43; *see* 28 U.S.C. § 2107(a); Fed. R. App. P. 4(a)(1)(A). This Court has jurisdiction over this appeal from a final judgment pursuant to 28 U.S.C. § 1291.

---

[1] Entries on the district court's docket are cited "Doc.," plaintiffs' opening brief is cited "AT Br.," and the short appendix is cited "SA."

**ISSUES PRESENTED**

1.      Whether the district court correctly held that section 15(g) of the Illinois TRUST Act is not preempted by federal law.

2.      Whether the district court correctly held that section 15(g) does not violate principles of federal intergovernmental immunity.

# STATEMENT OF THE CASE

## A.    Legal background

The Constitution gives the federal government broad authority to regulate immigration. *Arizona v. United States*, 567 U.S. 387, 394-95 (2012).  To effectuate that grant of authority, Congress has enacted an "extensive and complex" set of statutes regulating the conditions under which noncitizens can remain in the United States and the circumstances under which those ineligible to remain are subject to removal.  *Id.* at 395; *see, e.g.*, 8 U.S.C. §§ 1226, 1231.

"The pervasiveness of federal regulation," however, "does not diminish the importance of immigration policy to the States." *Arizona*, 567 U.S. at 395.  States retain their traditional authority to regulate, even when those regulations concern noncitizens.  *See, e.g.*, *DeCanas v. Bica*, 424 U.S. 351, 355 (1976).  And Congress has established specific mechanisms by which States can assist the federal government in enforcing federal immigration law, if they choose to.  States and their subdivisions may, for instance, enter into "written agreement[s]" with the federal government to investigate, apprehend, and detain noncitizens who are suspected of violating federal immigration law.  8 U.S.C. § 1357(g).  And, as relevant here, federal law authorizes the federal government to "enter into a cooperative agreement with any State, territory, or political subdivision thereof" in support of "detention services," *id.* § 1103(a)(11)(B)—that is, the detention of individuals the federal government believes are present in violation of U.S. immigration law.

These statutory mechanisms require States' voluntary consent to assist the federal government in its immigration enforcement efforts. They thus respect the Tenth Amendment rule that the federal government may not "command the States' officers . . . to administer or enforce a federal regulatory program." *Printz v. United States*, 521 U.S. 898, 935 (1997); *see Murphy v. NCAA*, 138 S. Ct. 1461, 1477 (2018). Consistent with that prerogative, States have made different decisions about whether to assist the federal government in enforcing federal immigration law. Some States have determined that neither they nor their agents—including their political subdivisions, like counties and cities—will help enforce federal immigration law. *See, e.g.*, Cal. Gov't Code § 7282.5; N.J. A.G. Law Enf. Directive No. 2018-6.[2] Other States have made the opposite decision, directing their agents—again, including counties and cities—to assist federal immigration enforcement efforts, including by complying with requests to detain individuals who would otherwise be released from state custody. *See, e.g.*, Tex. Code Crim. Proc. art. 2.251; *City of El Cenizo v. Texas*, 890 F.3d 164, 174 (5th Cir. 2018).

Over the last five years and spanning successive gubernatorial administrations, Illinois has taken steps to minimize the involvement of the State and its agents with federal immigration enforcement. In 2017, the State enacted the Illinois TRUST Act, which expressly barred state and local officials from detaining persons based on their citizenship or immigration status, or based on federal civil immigration warrants and similar administrative directives. *See* 5 ILCS 805/1 *et seq.*

---

[2] https://www.nj.gov/oag/newsreleases19/ag-directive-2018-6_v2.pdf.

The purpose of the Act, as then-Governor Bruce Rauner explained, was to "keep . . . communities safer" by building trust between noncitizens and law enforcement. Kim Geiger, Chicago Tribune, *Rauner Signs Immigration, Automatic Voter Registration Bills Into Law*, Aug. 28, 2017.[3] The Act aimed to do so by reducing fears among both undocumented immigrants and their lawfully present family and friends that turning to local law enforcement officials could result in deportation. *See City of Chi. v. Barr*, 961 F.3d 882, 886-87 (7th Cir. 2020) (many governments have "determined that . . . effective law enforcement requires the cooperation of [their] undocumented residents"); Cora Engelbrecht, *Fewer Immigrants Are Reporting Domestic Abuse; Police Blame Fear of Deportation*, N.Y. Times, June 3, 2018.[4]

This case concerns an amendment to the TRUST Act. In August of last year, the General Assembly passed, and Governor Pritzker signed into law, the Illinois Way Forward Act, which further limits the circumstances under which state and local officials can assist in federal immigration enforcement. *See* Ill. Pub. Act No. 102-234. As relevant here, the Way Forward Act amended section 15 of the TRUST Act by adding subsection 15(g). That subsection provides that "[n]o law enforcement agency, law enforcement official, or any unit of State or local government may enter into or renew any contract" or other agreement "to . . . detain individuals for federal civil immigration violations." 5 ILCS 805/15(g)(1). Section 15(g) further directed law

---

[3]  https://www.chicagotribune.com/politics/ct-bruce-rauner-immigration-voting-met-0829-20170828-story.html.

[4]  https://www.nytimes.com/2018/06/03/us/immigrants-houston-domestic-violence.html.

enforcement agencies with "existing contract[s]" to detain such persons to exercise those agreements' termination provisions by January 1, 2022. *Id.* 805/15(g)(2).

## B. Procedural history

Plaintiffs are two Illinois counties that, at the time of section 15(g)'s enactment, had contracts with the federal government to detain individuals for civil immigration violations in exchange for payment. Under both federal and Illinois law, counties such as plaintiffs "never were and never have been considered as sovereign entities." *Reynolds v. Sims*, 377 U.S. 533, 575 (1964). Rather, they are "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Id.*; *accord Redmond v. Novak*, 427 N.E.2d 53, 58 (Ill. 1981) (counties are entitled to "exercise only those powers expressly granted to them by the legislature or those which arise therefrom by necessary implication"); Ill. Const. art. VII, § 7.[5]

Plaintiffs' agreements with the federal government, SA9-38, authorized each plaintiff county to provide "housing, safekeeping, and subsistence" to "Federal detainees," including detainees in the custody of U.S. Immigration and Customs Enforcement—i.e., immigrant detainees. SA9, SA25. Plaintiff McHenry County entered into its agreement, under which it received a "per diem" of $95 per detainee per day, in 2014. SA9; Doc. 10-1 at 1. Plaintiff Kankakee County entered into its

---

[5] The Illinois Constitution confers different authority on "home rule units," which "may exercise any power and perform any function pertaining to [their] government and affairs" unless withdrawn by the General Assembly. Ill. Const. art. VI, § 6. But plaintiffs are not home rule units, nor have they advanced a claim under the Illinois Constitution.

agreement, under which it received a "per diem" of $90 per detainee per day, in 2019. SA25; Doc. 10-1 at 3. Each agreement stated that it could be terminated at any time, for any reason, on 30 days' notice. SA11-12, SA27. According to plaintiffs, the agreements had historically brought in roughly $12 million in annual revenue before the enactment of section 15(g). AT Br. 3.

In September 2021, plaintiffs filed this suit challenging section 15(g) and sought a preliminary injunction barring the Attorney General from enforcing it. Docs. 1, 9. They argued that section 15(g) was preempted by various federal statutes—mainly 8 U.S.C. § 1103(a)(11)(B), which authorizes the federal government to "enter into . . . cooperative agreement[s]" with state and local governments for detaining noncitizens—and that it violated principles of federal intergovernmental immunity. Doc. 10 at 4-10. Plaintiffs contended that they would suffer irreparable injury if section 15(g) took effect because they would lose "revenue" generated by the agreements. *Id.* at 11-14.

The district court dismissed the complaint for failure to state a claim and denied plaintiffs injunctive relief. SA39. The district court rejected plaintiffs' preemption claim on two grounds. First, the court held, the federal statute on which plaintiffs primarily relied, 8 U.S.C. § 1103(a)(11)(B), lacked preemptive force because, under *Murphy v. NCAA*, 138 S. Ct. 1461, preemption claims must be "based on a federal law that regulates the conduct of private actors," which section 1103(a)(11)(B) does not. SA43-44. Second, even applying traditional preemption analysis, the court held, section 15(g) was not preempted because the federal statutes

plaintiffs cited do not reflect a "clear and manifest" intent by Congress to "upend[] the State's historic authority" to control its political subdivisions. SA44-45. Plaintiffs' preemption claim therefore failed. The same was true, the district court explained, of plaintiffs' claim that section 15(g) violated intergovernmental immunity principles, because Illinois had not directly regulated or discriminated against the federal government by exercising its Tenth Amendment prerogative not to assist in enforcing federal immigration law. *Id.* at 8. The court accordingly dismissed plaintiffs' complaint and denied their motion for injunctive relief. *Id.*

Plaintiffs appealed, Doc. 43, and asked the district court to enjoin enforcement of section 15(g) pending appeal, Doc. 46. The district court denied plaintiffs' motion, explaining that their likelihood of success on appeal was "slim" and that any financial injury they might incur while the appeal was pending was "insufficient when balanced against the[] small likelihood" they would prevail on appeal. SA47-50.

Plaintiffs renewed their request for an injunction pending appeal with this Court, which ultimately rejected the request. SA51. This Court explained that plaintiffs had "not demonstrated a likelihood that the district court erred in holding that [section 15(g)] is not preempted by federal law," and that section 15(g) likewise "d[id] not appear to violate principles of intergovernmental immunity." SA52. The Court further explained that plaintiffs "ha[d] not shown that they [were] threatened with imminent irreparable harm or that the balance of harms or the public interest favor[ed] an injunction pending appeal." *Id.*

## SUMMARY OF ARGUMENT

The district court correctly dismissed the complaint, recognizing that neither of plaintiffs' Supremacy Clause claims has merit. That judgment should be affirmed.

First, section 15(g) is not preempted by federal law. Federal law authorizes the U.S. Attorney General to arrange for the detention of noncitizens and allows him to enter into "cooperative agreements" with state and local governments to use their facilities for that purpose. Section 15(g) does no more than establish a state policy of declining to enter into such agreements—a decision that Illinois is entitled to make under both the Tenth Amendment and the very provisions of federal law that plaintiffs cite. Plaintiffs acknowledge, as they must, that these statutory provisions do not expressly preempt section 15(g), instead contending that section 15(g) is somehow implicitly preempted by federal law. But plaintiffs' attempt to manufacture a conflict between federal and state law, or to explain why Congress has precluded Illinois from regulating in this area, fails for the same reason that any express-preemption claim would: The federal statutes on which plaintiffs rely require state consent, and so cannot be understood to preempt a state law withdrawing such consent, no matter how the claim is framed.

Second, section 15(g) is likewise not barred by principles of intergovernmental immunity. Those principles prohibit a State from regulating the federal government directly or discriminating against it or its contractors. But section 15(g) does not regulate any third party; it reflects only Illinois's decision that it and its subdivisions will no longer participate in federal immigration detention efforts. A State cannot be

said to "discriminate" against the federal government by making that decision; were it otherwise, the intergovernmental immunity doctrine would swallow the Tenth Amendment. Even setting that aside, section 15(g) does not transgress immunity principles, because it does not regulate the United States directly and does not "discriminate" against anyone. Rather, it enacts a generally applicable policy of declining to allow state and local facilities to be used for certain purposes.

**ARGUMENT**

The district court correctly dismissed plaintiffs' complaint. Section 15(g) is not preempted by any of the federal laws plaintiffs cite, and a State's decision that neither it nor its political subdivisions will participate in federal immigration efforts—a decision it is constitutionally entitled to make—cannot be understood as discrimination against the federal government. The judgment below should be affirmed.[6]

## I. This Court Reviews The District Court's Dismissal Of The Complaint De Novo.

This Court reviews de novo a district court's order granting a motion to dismiss under Rule 12(b)(6) for failure to state a claim. *Kubiak v. City of Chicago*, 810 F.3d 476, 480 (7th Cir. 2016). On de novo review, this Court applies the same legal and procedural standards that the district court would, *Santiago v. Walls*, 599 F.3d 749, 756 (7th Cir. 2010), and may affirm the judgment on any ground supported by the record and the law, *Hernandez v. Cook Cnty. Sheriff's Off.*, 634 F.3d 906, 912 (7th Cir. 2011).

---

[6] Plaintiffs raise an additional issue for the first time on appeal: whether, as the Ninth Circuit has held, justiciability principles prevent federal courts from hearing claims like plaintiffs'. *See* AT Br. 7-10. The Attorney General agrees with plaintiffs that their claims are justiciable. *See Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of New Jersey*, 8 F.4th 176, 180-81 (3d Cir. 2021); *Tweed-New Haven Airport Auth. v. Tong*, 930 F.3d 65, 72-73 (2d Cir. 2019), *cert. denied*, 138 S. Ct. 2508 (2020).

## II. The District Court Correctly Held That Section 15(g) Is Not Preempted By Federal Law.

Plaintiffs' primary claim is that various federal statutes authorizing the federal government to detain noncitizens somehow preempt section 15(g). AT Br. 10-22. As the district court held, SA42-45, that argument fails on multiple levels.

### A. Section 15(g) is not preempted under traditional preemption principles.

Under traditional preemption principles, section 15(g) is not preempted. Congress may preempt a state law "through express language in a statute," or "implicitly," either "through 'field' pre-emption' or 'conflict' pre-emption." *Oneok, Inc. v. Learjet, Inc.*, 575 U.S. 373, 376-77 (2015); *accord Nelson v. Great Lakes Educ. Loan Servs., Inc.*, 928 F.3d 639, 646 (7th Cir. 2019). Here, section 15(g) is neither expressly nor implicitly preempted.

### 1. Section 15(g) is not expressly preempted.

As plaintiffs essentially concede, AT Br. 16-22, section 15(g) is not expressly preempted by federal law. Plaintiffs' preemption argument rests primarily on two federal statutes, 8 U.S.C. §§ 1103(a)(11)(B) and 1231(g), which concern where and how federal officials may detain noncitizens for violating federal immigration law. Section 1231(g) authorizes the U.S. Attorney General to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal," and instructs him to "consider the availability for purchase or lease of any existing" detention facility before building a new one. 8 U.S.C. § 1231(g)(1), (2). Section 1103(a)(11)(B) effectuates that authority in part by authorizing the U.S. Attorney

General to "enter into . . . cooperative agreement[s] with any State, territory, or political subdivision thereof" to facilitate the detention of noncitizens.  *Id.* § 1103(a)(11)(B).

As their plain language demonstrates, these provisions do not withdraw or limit state authority, and so do not expressly preempt section 15(g).  Indeed, as the Ninth Circuit has explained, if anything these statutes underscore States' authority to make voluntary decisions whether to assist the federal government in detaining noncitizens by "clarif[ying] that the federal government cannot commandeer state and local governments into serving federal functions," *GEO Group, Inc. v. Newsom*, 15 F.4th 919, 933 (9th Cir. 2021), consistent with the Tenth Amendment.  Section 1103(a)(11) does so by authorizing federal officials to use state facilities only after entering into "cooperative agreement[s]" with state and local governments, 8 U.S.C. § 1103(a)(11)(B), and section 1231(g) does so by emphasizing that federal officials may employ "existing" detention facilities only by "purchas[ing] or leas[ing]" them, *id.* § 1231(g)(2).  Section 15(g) is fully consistent with these statutes:  It reflects Illinois's decision that it and its political subdivisions will neither sign cooperative agreements with the federal government nor lease their facilities for the purpose of facilitating federal immigration detention.

### 2.    Section 15(g) is not field-preempted.

Recognizing that federal law does not expressly preempt section 15(g), plaintiffs instead invoke field and conflict preemption principles, AT Br. 16-22, but those principles are unavailing.  "Field preemption is rare."  *Nelson*, 928 F.3d at 651.

It applies only "when federal law occupies a field of regulation so comprehensively that it has left no room for supplementary state legislation." *Id.* at 651-52 (internal quotation marks omitted). That is not the case here.

To start, plaintiffs' cited statutes do not reflect any intent to occupy a field, much less to leave "no room" for statutes like section 15(g). *Nelson*, 928 F.3d at 652. "Field preemption is confined to only a few areas of the law," *id.*, and even in the immigration context Congress has rarely legislated "so comprehensively," *id.* at 651, as to preclude state regulation altogether. Indeed, although the Supreme Court has held that Congress "has occupied the field of alien registration," *Arizona*, 567 U.S. at 401—i.e., the registration of noncitizens in the United States—it has in no other area found a state immigration statute barred under field-preemption principles, and both it and other courts regularly reject assertions of field preemption in the immigration context. *See, e.g.*, *Kansas v. Garcia*, 140 S. Ct. 791, 805-06 (2020) (Congress has not fully occupied field of alien employment verification); *El Cenizo,* 890 F.3d at 176-77 (same for "field of 'immigration enforcement'"); *Puente Arizona v. Arpaio*, 821 F.3d 1098, 1106 (9th Cir. 2016) (same for field of identity theft); *Keller v. City of Fremont*, 719 F.3d 931, 940-43 (8th Cir. 2013) (same for "anti-harboring 'field'").

Plaintiffs' cited statutes, which govern where and how federal officials may detain noncitizens for violating federal immigration law, fit comfortably within this framework. As noted, *supra* pp. 12-13, neither section 1103(a)(11)(B) nor section 1231(g) withdraws state authority to decide whether to assist the federal government in detaining noncitizens; to the contrary, they expressly recognize state authority to

make that decision. Congress can hardly be said to have "left no room" for States to regulate, *Nelson*, 928 F.3d at 652, by affirming state authority to do just that.

The Fifth Circuit's decision in *El Cenizo*, 890 F.3d 164, rests on a similar principle. There, advocacy organizations challenged a Texas statute directing cities, counties, and their law enforcement agencies to cooperate with federal immigration enforcement efforts, including by "'assisting or cooperating with a federal immigration officer as reasonable or necessary.'" *Id.* at 173-74 (quoting Tex. Gov't Code § 752.053(b)(2)). Plaintiffs argued that this requirement was field preempted by scattered sections of the Immigration & Nationality Act ("INA") that established mechanisms for state and local involvement in immigration enforcement, but the Fifth Circuit disagreed. *Id.* at 176-78. "Federal law," it explained, "regulates *how* local entities may cooperate in immigration enforcement," whereas the challenged law "specifie[d] *whether* they cooperate." *Id.* at 177 (emphasis in original). Indeed, that court reasoned, because Congress could not have constitutionally enacted a statute "compelling" Texas and its subdivisions to assist in federal immigration enforcement efforts, it would seem "impossible" that Congress could have "occupied the field" inhabited by the law in question. *Id.* at 178. The same is true here.

The authority on which plaintiffs rely, AT Br. 17-20, is far afield. As they did below, plaintiffs begin by citing a string of out-of-circuit cases that observe that Congress has "'placed the responsibility of determining where aliens are detained within the discretion of the Attorney General,'" AT Br. 17 (quoting *Comm. of Cent. Am. Refugees v. INS*, 795 F.2d 1434, 1440 (9th Cir. 1986)), or something of that sort.

15

But these opinions make these uncontroversial observations while rejecting noncitizens' claims that they should have been relocated to some other detention facility, and do not hold that Congress has occupied the "field" of immigration detention (or any other). *See Gandarillas-Zambrana v. BIA*, 44 F.3d 1251, 1256 (4th Cir. 1995); *Comm. of Cent. Am. Refugees*, 795 F.2d at 1440; *Sanchez-Soriano v. United States*, No. 09-cv-500, 2011 WL 6217063, at *2 (S.D. Ill. Aug. 2, 2011); *Calderon v. Moyers*, 558 F. Supp. 19, 21 (N.D. Ill. 1982). Indeed, none of these cases concerns preemption at all. In any event, section 15(g) does not purport to tell the federal government where to detain any individual noncitizen; it simply reflects Illinois's decision that its own facilities will not be among the available options.

Plaintiffs' remaining authorities, AT Br. 18-20, are of no more help to them. Plaintiffs describe at length a New Jersey intermediate appellate court case, *ACLU of New Jersey, Inc. v. County of Hudson*, 799 A.2d 629 (N.J. App. Div. 2002), but that case has no bearing here: It concerned only the intersection of state and federal public-records statutes, *id.* at 654, a question of no relevance to this case. Plaintiffs also invoke the Ninth Circuit's recent opinion in *GEO Group*, 15 F.4th 919, which held a California statute regulating private prisons preempted, but that opinion did not rest on a field-preemption holding. Indeed, the district court there rejected the plaintiffs' field-preemption argument, holding that Congress had *not* "occup[ied] . . .

the field of immigration detention," and the plaintiffs did not renew that argument on appeal, presumably because it lacked merit. *Id.* at 947 (Murguia, J., dissenting).[7]

### 3. Section 15(g) is not conflict-preempted.

Plaintiffs also err in asserting, AT Br. 20-22, that section 15(g) is conflict-preempted. "Conflict preemption applies when there is an actual conflict between state and federal law such that it is impossible for a person to obey both, or when state law stands as an obstacle to fully accomplishing the objectives of Congress." *Nelson*, 928 F.3d at 646-47. Plaintiffs do not argue that it is impossible for them to comply with both federal and state law, nor could they. Instead, they argue only that section 15(g) "stands as an obstacle to the execution of" Congress's purposes, insofar as the statutes on which they rely reflect a congressional preference that the federal government be able to "use local government detention facilities." AT Br. 21. Plaintiffs' argument fails.

Most basically, plaintiffs' obstacle-preemption theory ascribes an intent to Congress that cannot be found in the statutes they cite. "Implied preemption analysis does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives'; such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Com. v. Whiting*, 563 U.S. 582, 607 (2011). Instead, even an obstacle-preemption claim must "stem from . . . a valid statute enacted by Congress." *Garcia*, 140 S. Ct.

---

[7] To the extent plaintiffs mean to invoke *GEO Group*'s conflict-preemption holding, that holding is easily distinguishable, as explained below, *infra* pp. 21-22.

at 801; *accord Virginia Uranium, Inc. v. Warren*, 139 S. Ct. 1894, 1901 (2019) (lead opinion of Gorsuch, J.) ("Invoking some brooding federal interest or appealing to a judicial policy preference" does not show preemption).

Here, plaintiffs' cited statutory provisions are clear, and do not permit the inference they draw. Congress directed the federal government to detain certain noncitizens, 8 U.S.C. §§ 1226(a), 1231(a), and permitted it to construct new detention facilities if necessary to do so, *id.* § 1231(g)(1), but told it to "consider the availability for purchase or lease of existing" detention facilities before embarking on any such construction project, *id.* § 1231(g)(2). Congress further authorized the federal government to "enter into . . . cooperative agreement[s]" with States and their subdivisions, if necessary, in order to further this project. *Id.* § 1103(a)(11)(B). These provisions may reflect Congress's hope that the Executive Branch would not spend appropriated dollars to build new facilities when it could use existing ones. But they certainly give the Executive no authority to dragoon state, local, or private detention facilities into service. To the contrary, these statutes expressly recognize that the federal government can use these facilities only after securing consent. *Supra* pp. 12-13. Withholding consent (as section 15(g) does) can pose no "obstacle" to a statutory scheme that is premised, at bottom, on obtaining exactly that consent.

Indeed, the Ninth Circuit reached a similar conclusion in *United States v. California*, 921 F.3d 865 (9th Cir. 2019), *cert. denied*, 141 S. Ct. 124 (2020). That case concerned, among other things, the constitutionality of a California statute generally prohibiting state and local law enforcement agencies from cooperating with

18

federal immigration enforcement efforts (including by detaining persons suspected of violating civil immigration law). *Id*. at 876. The federal government argued that the statute was preempted by various INA provisions, but the Ninth Circuit disagreed: Because the federal scheme "provide[d] states the *option*, not the *requirement*, of assisting federal immigration authorities," a State's decision not to do so could not give rise to an obstacle-preemption claim. *Id*. at 889. "[T]he choice of a state to refrain from participation," the court added, "cannot be invalid under the doctrine of obstacle preemption where, as here, it retains the right of refusal." *Id*. at 890. So too here: Illinois's decision that neither it nor its subdivisions will use their facilities to house individuals detained for civil immigration violations cannot give rise to a claim of obstacle preemption because both the Tenth Amendment and the very statutes on which plaintiffs rely allow it to make exactly that decision.

Plaintiffs have no effective response. Their argument appears to be that Congress intended to authorize state subdivisions to enter into agreements with the federal government even when state law bars state subdivisions from doing so. AT Br. 21. As the district court explained, however, SA44-45, that reading of federal law is both textually implausible and would create constitutional problems. The only textual cue plaintiffs have ever identified that could support that interpretation is section 1103(a)(11)(B)'s inclusion of state "political subdivisions" among the entities with whom the federal government may enter into "cooperative agreement[s]." *See* 8 U.S.C. § 1103(a)(11)(B). But the statute's grant of authority to the federal government to enter into agreements with state subdivisions cannot fairly be read to

give those subdivisions the authority to enter into such agreements where doing so would require disobeying the law of their home States. Plaintiffs make no genuine textual argument to the contrary.

In any event, as the district court correctly reasoned, SA44-45, plaintiffs' reading of section 1103(a)(11) would raise serious constitutional concerns. A State is entitled to determine "the structure of its government," a matter at the heart of how "a State defines itself as a sovereign." *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991); *accord Nixon v. Missouri Mun. League*, 541 U.S. 125, 140 (2004). That includes a State's prerogative to grant or withhold certain authority from its subdivisions. *Nixon*, 541 U.S. at 140. Accordingly, if Congress wants to "interfere[] with" a decision a State has made regarding the authority allocated to its subdivisions, it must "make its intention to do so 'unmistakably clear in the language of the [relevant] statute.'" *Gregory*, 501 U.S. at 460. As the district court explained, section 1103(a)(11)(B) contains no such plain statement: Congress's mere "use of the phrase 'or political subdivision thereof' does not make clear and manifest" any intent to "prohibit the state from controlling its political subdivisions." SA45. It therefore cannot be read to reflect any congressional intent to reorder the ordinary balance of state and local authority in this area.

The Supreme Court's decision in *Nixon* rests on a similar principle. At issue there was a federal law preempting any state statutes that "'prohibit[ed] the ability of any entity' to provide telecommunications services." 541 U.S. at 128. Missouri enacted a statute that prohibited its own political subdivisions from providing

telecommunications services, and a group of municipalities sued, arguing that the state statute was preempted by the federal law. *Id.* at 129-31. The Supreme Court held that the state statute was not preempted. *Id.* at 141. Although the Court accepted that the federal law's reference to "any entity" could in theory be read to apply to municipalities, that conclusion, it explained, would mean "interposing federal authority between a State and its municipal subdivisions." *Id.* at 140. Invoking *Gregory*'s principle "that federal legislation threatening to trench on the States' arrangements for conducting their own governments should be treated with great skepticism," the Court held that "the want of any 'unmistakably clear' statement" in the statute required reading it to "preserve[] [the] State's chosen disposition of its own power." *Id.* As the district court explained, SA44-45, the same principle requires the same result here: Absent a clear statement to the contrary, section 1103(a)(11) cannot be read to "interpos[e] federal authority between" Illinois and its subdivisions, 541 U.S. at 140.

The Ninth Circuit's recent opinion in *GEO Group*, 15 F.4th 919, is not to the contrary. That case concerns a California statute prohibiting private companies from operating detention centers within that State. *Id.* at 925-26.[8] A divided panel of the Ninth Circuit held that the statute was conflict-preempted, reasoning that it interfered with the federal government's "broad power and discretion to arrange for appropriate places of detention, including the right to contract with private

---

[8] The Ninth Circuit issued its opinion in *GEO Group* on October 5, 2021. California has filed a petition for rehearing en banc, which remains pending. *See* Docket in Nos. 20-56172, 20-56304 (9th Cir.).

companies to operate detention facilities." *Id.* at 935. But section 15(g) is readily distinguishable from the California statute at issue in *GEO Group*: Whereas California, in the majority's view, had "ban[ned] contractors from contracting with the federal government," in conflict with federal law, *id.*, Illinois has simply decided that *it* (and its subdivisions) will not enter into agreements with the federal government for this purpose—a decision the Tenth Amendment and the relevant federal statutes entitle the State to make. Section 15(g), in other words, is like the statute upheld in *California*, not the statute held preempted in *GEO Group*, as it reflects Illinois's "choice . . . to refrain from participation," which "cannot be invalid under the doctrine of obstacle preemption" because Illinois is entitled by the Constitution (and, here, plaintiffs' cited statutes) to make it. *California*, 921 F.3d at 890.

**B.  Section 15(g) is not preempted under *Murphy*.**

Section 15(g) is also not preempted by plaintiffs' cited statutes for a second reason, as the district court explained, SA43-44: Under the Supreme Court's 2018 opinion in *Murphy v. NCAA*, 138 S. Ct. 1461, only federal laws that regulate private actors can be understood to preempt state law, and plaintiffs' cited statutes do not regulate private conduct.

*Murphy* concerned the constitutionality of a federal statute that directed States not to authorize certain forms of sports gambling. 138 S. Ct. at 1470-73. The federal government defended the law principally by arguing that it was a "valid preemption provision," *id.* at 1479, that merely "preempt[ed] state laws that

22

license[d] or authorize[d] private sports-gambling schemes," Brief for the United States at 17, *Murphy*, 138 S. Ct. 1461 (Nos. 16-476 & 16-477), 2017 WL 4805228; *see also id.* at 20-28; Brief for Respondents at 42-46, *Murphy*, 138 S. Ct. 1461 (Nos. 16-476 & 16-477), 2017 WL 4684747 (same argument). The Supreme Court rejected the government's characterization of the challenged statute as a preemption provision, stating that it was "no such thing." 138 S. Ct. at 1479. A federal statute, the Court explained, has preemptive force only if it "imposes restrictions or confers rights on private actors"—restrictions or rights that conflict with, and supersede, analogous restrictions or rights imposed by state law. *Id.* at 1480. Under that standard, the Court held, the federal statute at issue in *Murphy* could not "be understood as a regulation of private actors" and so lacked preemptive force. *Id.* at 1481.

Under *Murphy*, as the district court held, SA43-44, plaintiffs' preemption claims cannot succeed, because none of the statutes plaintiffs cite regulate private actors. Section 1231(g) concerns only the federal government—specifically, the U.S. "Attorney General." 8 U.S.C. § 1231(g)(1). Section 1103(a)(11) likewise concerns, as the district court noted, "only . . . public entities"—the federal government, States, and their subdivisions. SA43. Each statute "confers no rights and imposes no restrictions on any private actors." *Id.* Under *Murphy*, these statutes thus lack preemptive force, as the district court correctly held.

Multiple courts have reached similar conclusions in other cases, relying on *Murphy* to reject arguments that another provision of federal immigration law, 8 U.S.C. § 1373—which bars state and local governments from "prohibit[ing]" or

"restrict[ing]" their officials from sending immigration-related information to the federal government—preempts state laws imposing restrictions on information-sharing. Most prominently, the Third Circuit held last year in *Ocean County Board of Commissioners v. Attorney General of New Jersey*, 8 F.4th 176, that a New Jersey directive barring local law enforcement officers from sharing immigration-related information with the federal government was not preempted by § 1373, reasoning that the statute "does not regulate[] private actors" and so could not "serve as a basis for preemption." *Id.* at 182. Since *Murphy*, other courts have unanimously reached the same conclusion. *See, e.g.*, *Colorado v. U.S. Dep't of Just*ice, 455 F. Supp. 3d 1034, 1059 (D. Colo. 2020); *Oregon v. Trump*, 406 F. Supp. 3d 940, 972 (D. Or. 2019); *City & Cnty. of San Francisco v. Sessions*, 349 F. Supp. 3d 924, 950 (N.D. Cal. 2018), *aff'd in part, vacated in part*, 965 F.3d 753 (9th Cir. 2020).

Nevertheless, plaintiffs argue at length that the district court erred in relying on *Murphy*. AT Br. 11-16. Plaintiffs do not dispute that neither section 1231(g) nor section 1103(a)(11) regulates private actors, nor do they say that any other relevant statute does. Rather, they contend primarily that *Murphy*'s preemption discussion is dicta because it purportedly conflicts with prior Supreme Court precedent—principally *Lawrence County v. Lead-Deadwood School District*, 469 U.S. 256 (1985), a case plaintiffs say "involved *no* private actors." AT Br. 12 (emphasis in original). Plaintiffs' argument suffers from multiple flaws.

First, as the district court correctly explained, SA44, SA47-48, *Murphy*'s discussion of preemption principles was not dicta. As noted, *supra* pp. 22-23, the

parties in *Murphy* argued vigorously and extensively about whether the federal

statute there could be understood as a "valid preemption provision," 138 S. Ct. at

1479; indeed, the federal government made essentially no other argument in defense

of the statute, *see* Brief for the United States at 10-31, *Murphy*, 138 S. Ct. 1461 (Nos.

16-476 & 16-477), 2017 WL 4805228. The Supreme Court, for its part, rested its

preemption holding solely on the ground that the statute did not "impose[]

restrictions or confer[] rights on private actors," not on any other aspect of the

preemption analysis. 138 S. Ct. at 1480-81. Because *Murphy*'s preemption

discussion was "necessary to [its] result," *Seminole Tribe of Fla. v. Fla.*, 517 U.S. 44,

67 (1996), it is not dicta.

    In any event, there is no conflict between *Murphy* and plaintiffs' cited cases.

Plaintiffs rely mainly on *Lawrence County*, but that opinion is inapposite. *Lawrence

County* concerned a federal statute that "compensate[d] local governments for the

loss of tax revenues resulting from the tax-immune status of federal lands located in

their jurisdictions" and specified that the local government receiving the payment

could "'use [it] for any governmental purpose.'" 469 U.S. at 258-59 (quoting 31

U.S.C. § 6902(a)). The question was whether a South Dakota statute requiring all

local governments to "distribute federal payments in lieu of taxes in the same way

they distributed general tax revenues," *id.* at 259, conflicted with the federal law by

limiting the purposes on which local governments could spend their payments. The

Supreme Court held the state statute preempted, explaining that the federal law

reflected Congress's "clear intent to distribute funds directly to units of local

government," to be used as localities saw fit, and the state statute contravened that goal. *Id.* at 263.

Plaintiffs argue that *Lawrence County* and *Murphy* are in tension, insofar as *Lawrence County* involved no private actors, AT Br. 15, but *Lawrence County* rests on a legal principle applicable neither in *Murphy* nor in this case. As the Supreme Court explained in *Lawrence County*, the federal statute there "imposed a condition on [the] disbursement of federal funds," and so constituted an exercise of Congress's power under the Spending Clause. 469 U.S. at 269-70. It is long settled that Congress may preempt state law by setting conditions on the receipt of federal funds. *See Norfolk S. Ry. Co. v. Shanklin*, 529 U.S. 344, 352 (2000); *Dalton v. Little Rock Fam. Plan. Servs.*, 516 U.S. 474, 477 (1996) (per curiam). And when Congress does so, it need not "regulate individuals," *Murphy*, 138 S. Ct. at 1479, but can impose conditions on States directly (as long as those States consent). *Lawrence County* reflects this basic principle. By contrast, neither *Murphy* nor this case involves any such condition.[9]

Plaintiffs' remaining arguments are no more persuasive. Plaintiffs point to *Nixon*, which involved a statute barring States from preventing private parties from providing telecommunications services, AT Br. 12, but the statute at issue in *Nixon*

---

[9] Any suggestion that plaintiffs' cited statutes could be read to impose a condition on the receipt of federal funding—i.e., to confer on state subdivisions some entitlement to contract with the federal government on immigration matters—would fail for the basic reason that, as the district court explained, SA44-45, those statutory provisions cannot plausibly read to confer any such entitlement on state subdivisions, whether understood as a direct grant of authority or as a funding condition. *See supra* pp. 19-21. They certainly do not make any such intention "clear and manifest," as *Gregory* requires, 501 U.S. at 461.

clearly "confer[red] on private entities"—telecommunications companies—a right, namely "a federal right to engage in certain conduct subject to only certain (federal) constraints." *Murphy*, 138 S. Ct. at 1480; *see Nixon*, 541 U.S. at 129. The fact that the statute "appear[ed] to operate directly on States" by its text—as the Supreme Court explained in *Murphy* is true of some preemption statutes—was irrelevant. *See Murphy*, 138 S. Ct. at 1480 ("[I]t is a mistake to be confused by the way in which a preemption provision is phrased."). *Gomillion v. Lightfoot*, 364 U.S. 339 (1960), on which plaintiffs also rely (AT Br. 12, 15), has even less bearing here: It involved no preemption claim at all, and so it cannot conflict with *Murphy*.

Plaintiffs appear to think that the fact that *Lawrence County*, *Nixon*, and *Gomillion* were all brought by state subdivisions somehow suggests that *Murphy* misapprehended the relevant caselaw. AT Br. 15-16. But it is plaintiffs who misunderstand: A state subdivision may bring a preemption claim if it is concretely affected by a state law that they think is preempted (as plaintiffs are by section 15(g)), but that claim can succeed only if the relevant federal law in fact has preemptive force under *Murphy*. *See, e.g.*, *Tweed-New Haven Airport Auth.*, 930 F.3d at 73-74 (distinguishing between these inquiries). Thus, the fact that subdivisions may bring preemption suits—as all parties here agree, *see supra* p. 11 n.6—in no way undermines *Murphy*.

Finally, plaintiffs' arguments regarding *Murphy* are ultimately beside the point, because section 15(g) is not preempted wholly irrespective of *Murphy*. *See supra* pp. 12-22. The district court engaged a lengthy analysis of this issue, SA44-45,

but plaintiffs' opening brief contains not a single word in response. The Court can thus affirm on that basis alone. *See Klein v. O'Brien*, 884 F.3d 754, 757 (7th Cir. 2018) ("an appellate brief that does not even *try* to engage the reasons the appellant lost has no prospect of success" (emphasis in original)).

## III. The District Court Correctly Held That Section 15(g) Does Not Violate Principles Of Federal Intergovernmental Immunity.

Plaintiffs separately contend that section 15(g) violates the doctrine of federal intergovernmental immunity, which generally bars States from "regulat[ing] the United States directly or discriminat[ing] against [it] or those with whom it deals." *North Dakota v. United States*, 495 U.S. 423, 435 (1990) (plurality opinion). *See* AT Br. 22-25. As the district court held, however, SA46, section 15(g) does not violate these principles. Most basically, section 15(g) does not violate principles of federal intergovernmental immunity because it reflects only the State's decision not to help enforce federal immigration law—a decision Illinois is constitutionally entitled to make. And section 15(g) does not violate intergovernmental immunity principles for any other reason, because it does not regulate the United States or "discriminate" against it or its contractors.

### A. Section 15(g) reflects only the State's own decision not to participate in federal programs.

Plaintiffs' intergovernmental immunity claim fails at the threshold for one basic reason: Section 15(g) does not reflect the State's attempt to regulate anyone. Rather, section 15(g) reflects Illinois's decision that *it*, including its subdivisions, will no longer enter into "cooperative agreement[s]," 8 U.S.C. § 1103(a)(11)(B), to house

noncitizen detainees.  Plaintiffs identify no case to have struck down a state statute on intergovernmental immunity grounds where the state statute reflected no more than the State's voluntary decision not to participate in a federal program—a decision the Tenth Amendment entitles it to make, *see Murphy*, 138 S. Ct. at 1477. That makes good sense:  If it constituted "discrimination" for a State to decline to assist the federal government, in violation of immunity principles, then the Tenth Amendment would be a nullity, because a State's exercise of its Tenth Amendment prerogative would always violate the intergovernmental immunity doctrine.

Indeed, the Ninth Circuit's opinion in *California*, 921 F.3d 865, rests in part on the same reasoning.  There, the United States argued that a California statute barring state and local law enforcement officers from providing immigration-related information to the federal government violated the doctrine of intergovernmental immunity.  *Id.* at 891.  The Ninth Circuit summarily rejected that argument.  *Id.*  It explained that "[a] finding that [the law] violates the doctrine of intergovernmental immunity would imply that California cannot choose to . . . refus[e] to assist [federal] enforcement efforts—a result that would be inconsistent with the Tenth Amendment and the anticommandeering rule."  *Id.*  The same principles dictate the same result here, as the district court correctly reasoned.  *See* SA46 (concluding that section 15(g) does not violate intergovernmental immunity principles because federal law "leaves to the State the decision whether it or any of its political subdivisions enter" into agreements for immigration detention).

That basic rule also disposes of plaintiffs' cited authorities. The state law at issue in *GEO Group*, to take one example, did not reflect California's own decision not to participate in immigration enforcement efforts itself, but rather its regulation of third parties that did so. *See GEO Group*, 15 F.4th at 925-26. The same is true of plaintiffs' remaining cases, most of which involved States' regulation of other entities and none of which involved a State's constitutionally protected decision not to assist the federal government in enforcing federal law. *See, e.g.*, *Goodyear Atomic Corp. v. Miller*, 486 U.S. 174, 176-78 (1988) (application of state workers' compensation scheme to federal contractor); *Pub. Utils. Comm'n of Cal. v. United States*, 355 U.S. 534, 535-36 (1958) (application of state rate regulation to federal contractor); *Leslie Miller, Inc. v. Arkansas*, 352 U.S. 187, 190 (1956) (per curiam) (application of state licensing law to federal contractor). Section 15(g) does not regulate third parties; it establishes an Illinois state policy against housing certain immigrant detainees in state facilities. It cannot be understood to violate intergovernmental immunity principles in doing so.

**B.  Section 15(g) does not violate intergovernmental immunity principles in any other manner.**

Section 15(g) does not violate intergovernmental immunity principles in any event. The doctrine of intergovernmental immunity is derived from the Supremacy Clause, which requires that "the activities of the Federal Government [be] free from regulation by any state." *Mayo v. United States*, 319 U.S. 441, 445 (1943). A State therefore may not "regulate[] the United States directly or discriminate[] against the

Federal Government or those with whom it deals." *North Dakota*, 495 U.S. at 435 (plurality opinion). Section 15(g) does none of those things.

First, section 15(g) does not "regulate[] the United States directly." *North Dakota*, 495 U.S. at 435 (plurality opinion). By its own terms, the statute applies only to state and local law enforcement officials within Illinois. *See* 5 ILCS 805/15(g) (instructing "law enforcement agenc[ies], . . . official[s], [and] . . . unit[s] of State and local government" not to enter into certain agreements). As in *North Dakota*, section 15(g) at most "operate[s] against suppliers" of certain services to the federal government, not to the federal government itself, and so any "concerns about direct interference . . . therefore are not implicated." *North Dakota*, 495 U.S. at 437 (plurality opinion). The federal government may, notwithstanding section 15(g), continue to detain noncitizens in Illinois if it wants to; it simply must do so itself, without state or local assistance. That section 15(g) may have an "indirect[]" effect on federal immigration detention efforts, or might make those efforts "more costly," does not itself constitute a violation of the intergovernmental immunity doctrine. *Id.* at 435.

Plaintiffs repeatedly assert that section 15(g) "directly regulates the federal government," *e.g.*, AT Br. 22, 23, 25, but stating that does not make it so. And none of plaintiffs' cited cases holds that a law regulating entities with whom the federal government contracts can constitute "direct" regulation of the federal government. Indeed, *North Dakota* holds to the contrary: The Supreme Court there considered a state statute that required distillers that supplied alcohol to the federal government

(and only those distillers) to affix a label to the alcohol they supplied indicating the alcohol's destination.  495 U.S. at 428-29 (plurality opinion).  As a result of the statute, multiple distillers ceased supplying the federal government in North Dakota. *Id.* at 429.  The Supreme Court summarily rejected any suggestion that the statute "directly" regulated the federal government, explaining that it "operate[d] against suppliers, not the Government," *id.* at 437, notwithstanding the downstream effect the statute had on the federal government.  The same is true here:  If section 15(g) "operate[s] against" anyone (as opposed to simply reflecting the State's decision not to assist federal efforts, *supra* pp. 28-30), it is plaintiffs, not the United States.[10]

Nor does section 15(g) "discriminate[] against the Federal Government or those with whom it deals."  *North Dakota*, 495 U.S. at 435 (plurality opinion). Plaintiffs insist otherwise, arguing mainly that the statute constitutes impermissible "state regulation of . . . federal contractors"—i.e., themselves.  AT Br. 23.  But this argument is misplaced.

---

[10]  Plaintiffs' cited cases are not to the contrary.  The state statutes in *Goodyear*, *Public Utilities Commission*, and *Leslie Miller* were not held invalid on the ground that they directly regulated the federal government.  To the contrary, the statute in *Goodyear* was found valid, *see* 486 U.S. at 182, and the statutes in *Public Utilities Commission* and *Leslie Miller* were found invalid because they were preempted by federal law, *see North Dakota*, 495 U.S. at 440 (plurality opinion) (describing these cases as preemption cases).  The city ordinance in *United States v. City of Arcata*, 629 F.3d 986 (9th Cir. 2010), by contrast, *was* held invalid because it sought to "directly regulate the conduct of agents of the federal government," *id.* at 991, but for good reason:  It purported to prohibit certain conduct by federal employees and imposed civil penalties for failure to comply, *id.* at 988-89.  Section 15(g) does nothing of the sort.

Most basically, the argument reflects a misunderstanding of plaintiffs' own relationship to the State. Plaintiffs are not "federal contractors"—i.e., third parties subject to state regulation. Plaintiffs are subdivisions of the State, not "sovereign entities" but "subordinate governmental instrumentalities created by the State to assist in the carrying out of state governmental functions." *Reynolds*, 377 U.S. at 575; *accord, e.g.*, *Trenton v. New Jersey*, 262 U.S. 182, 187 (1923) (State subdivisions like counties are "merely . . . department[s] of the State, and the State may withhold, grant or withdraw powers as it sees fit."). As such, plaintiffs can "exercise only those powers expressly granted to them by the legislature." *Redmond*, 427 N.E.2d at 58; Ill. Const. art. VII, § 7. Indeed, plaintiffs acknowledged as much below, conceding that their power to enter into agreements with the United States was subject to limitation by the General Assembly and could be withdrawn at any time. *See* Doc. 39 at 7 (plaintiffs' acknowledgment, in supplemental briefing before the district court, that the General Assembly "is vested with the power to make laws prohibiting intergovernmental cooperation by units of local government"). Plaintiffs therefore mischaracterize both themselves and section 15(g). That statute does not regulate "federal contractors," AT Br. 23; it simply reflects the State's decision that the State itself—including its subdivisions—will no longer help the federal government detain persons for civil immigration violations, *supra* pp. 28-30.

Regardless, section 15(g) does not violate immunity principles. For one, it is not "impermissible," AT Br. 23, for a State to regulate those with whom the federal government contracts. As the Supreme Court explained in *North Dakota*, it is a

"normal incident[]" of dual sovereignty that the federal government's contractors will be subject to state regulation, and that such regulations may impose "burdens" on the federal government. 495 U.S. at 435 (plurality opinion). "A state regulation" that does not directly regulate the federal government, the Court explained, is thus invalid only if it "discriminates against" that government or its contractors. *Id.* at 437-38. So even if section 15(g) could be said to regulate plaintiffs' contracting activities with the federal government, that fact alone would not violate the doctrine of intergovernmental immunity.

And section 15(g) does not "discriminate" against either the United States or plaintiffs as its contractors. Section 15(g) does not, for instance, impose some burden on plaintiffs based on their "status as . . . Government contractor[s] or supplier[s]" that is not imposed on "other similarly situated constituents of the State." *North Dakota*, 495 U.S. at 437-38 (plurality opinion). Plaintiffs may exercise exactly the same prerogatives as all other state subdivisions. Indeed, like all other subdivisions, they may even continue to provide detention services to the federal government (for instance, by detaining federal prisoners, persons awaiting trial, or other detainees), as plaintiff Kankakee County did for a decade before beginning to house immigrant detainees in 2016, Doc. 10-1 at 3 (¶ 2). Nor does section 15(g) "treat [anyone] else better than" the federal government. *Washington v. United States*, 460 U.S. 536, 544-45 (1983). It does not, for instance, bar entities from housing detainees for the federal government while allowing them to house similarly situated detainees for the State, as did the statute at issue in *GEO Group*. *See* 15 F.4th at 937-38 (state statute

"exempted large swaths of state contractors" but "provided no comparable exceptions for the federal government").  And although plaintiffs insist that section 15(g) is discriminatory because it bars only the detention of persons for civil immigration violations, an "exclusively federal activity," AT Br. 25, that discrimination-by-proxy theory is incorrect.  A State "discriminates" for intergovernmental immunity purposes only where "no significant differences between" federal and state interests "justify [any] differential treatment," *Dawson v. Steager*, 139 S. Ct. 698, 703 (2019) (cleaned up), and here Illinois has reasonably determined that separating day-to-day law enforcement from immigration enforcement aids state and local policing efforts by building trust between the State and immigrant communities.  Section 15(g)'s bar on immigrant detention does not "discriminate" against the federal government by enacting a policy rooted in a reasonable distinction of that kind.

## CONCLUSION

For these reasons, this Court should affirm the district court's judgment.

Respectfully submitted,

**KWAME RAOUL**
Attorney General
State of Illinois

**JANE ELINOR NOTZ**
Solicitor General

/s/ Alex Hemmer
**ALEX HEMMER**
Deputy Solicitor General
100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-5526
Alex.Hemmer@ilag.gov

100 West Randolph Street
12th Floor
Chicago, Illinois 60601
(312) 814-3312

Attorneys for Defendant-Appellant

February 24, 2022

# CERTIFICATE OF COMPLIANCE

I hereby certify that this brief complies with the type-volume limitations of Federal Rule of Appellate Procedure 32(a)(7)(A) and Circuit Rule 32(c) because it contains 8,689 words (excluding the parts exempted by Federal Rule of Appellate Procedure 32(a)(7)(B)(iii)). This brief also complies with the typeface requirements of Federal Rule of Appellate Procedure 32(a)(5) and Circuit Rule 32(a) because it has been prepared in a proportionally spaced typeface (12-point Century Schoolbook) using Microsoft Word.

/s/ Alex Hemmer
ALEX HEMMER

February 24, 2022

**CERTIFICATE OF FILING AND SERVICE**

I hereby certify that on February 24, 2022, I electronically filed this brief with the Clerk of the Court for the United States Court of Appeals for the Seventh Circuit using the CM/ECF system.

All participants in the case are registered CM/ECF users and service will be accomplished by the CM/ECF system.

/s/ Alex Hemmer
ALEX HEMMER