No. 21-3334

IN THE UNITED STATES COURT OF APPEALS
FOR THE SEVENTH CIRCUIT

MCHENRY COUNTY, ILLINOIS, *et al.*,
APPELLANTS,

v.

KWAME RAOUL,
APPELLEE.

ON APPEAL FROM A JUDGMENT OF THE UNITED STATES
DISTRICT COURT FOR THE NORTHERN DISTRICT OF ILLINOIS

**BRIEF FOR THE DISTRICT OF COLUMBIA AND THE STATES OF
CALIFORNIA, CONNECTICUT, DELWARE, MAINE, MARYLAND,
MASSACHUSETTS, MINNESOTA, NEVADA, NEW JERSEY, NEW
MEXICO, NEW YORK, OREGON, RHODE ISLAND, VERMONT, AND
WASHINGTON IN SUPPORT OF APPELLEE**

KARL A. RACINE
Attorney General for the District of Columbia

CAROLINE S. VAN ZILE
Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

MATTHEW E. MORRIS
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
caroline.vanzile@dc.gov

## TABLE OF CONTENTS

INTRODUCTION AND INTEREST OF AMICI ......................................................1

ARGUMENT ........................................................................................................5

    I.    Federal Immigration Law Does Not Preempt The Act ........................5

        A.    The Act does not stand as an obstacle to the implementation of federal immigration law ..............................5

            1.    Congress expressed no "clear and manifest purpose" to override the historic right of states to limit their assistance with federal immigration enforcement ....................................................................6

            2.    States like Illinois have reasonably exercised their police powers to disentangle local law enforcement from federal immigration enforcement ..........................12

        B.    For these same reasons, the Act is not field preempted by federal immigration law ...........................................................24

    II.    Alternatively, Interpreting The INA To Preempt The Act Would Amount To Unconstitutional Commandeering ...................................26

CONCLUSION ....................................................................................................31

# TABLE OF AUTHORITIES

## *Cases*

*Altria Grp., Inc. v. Good*, 555 U.S. 70 (2008) ...................................... 6, 7, 9, 23, 24

*Arizona v. United States*, 567 U.S. 387 (2012)............................................ 8, 10, 24

*Bond v. United States*, 572 U.S. 844 (2014) ....................................................... 9, 24

*Chamber of Com. v. Whiting*, 563 U.S. 582 (2011)......................................................5

*City of Chicago v. Barr*, 961 F.3d 882 (7th Cir. 2020)........................................ 8, 26

*City of El Cenizo v. Texas*, 890 F.3d 164 (5th Cir. 2018)................................. 11, 25

*Coleman v. Thompson,* 501 U.S. 722 (1991).............................................................8

*Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363 (2000).................................6

*De Canas v. Bica*, 424 U.S. 351 (1976).................................................................25

*Engle v. Isaac*, 456 U.S. 107 (1982) .......................................................................13

*Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88 (1992) .................................5

*Gregory v. Ashcroft*, 501 U.S. 452 (1991)................................................................9

*Hillsborough County v. Automated Med. Lab'ys, Inc.*,
   471 U.S. 707 (1985)..............................................................................................7

*Hines v. Davidowitz*, 312 U.S. 52 (1941) ......................................................... 5, 24

*Kelley v. Johnson*, 425 U.S. 238 (1976) ...................................................................7

*Murphy v. NCAA*, 138 S. Ct. 1461 (2018) ........................................... 26, 27, 28, 30

*Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519 (2012) ............................ 8, 30

*New York v. United States*, 505 U.S. 144 (1992)................................... 8, 19, 27, 30

*Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*,
   8 F.4th 176 (3d Cir. 2021) ......................................................................... 23, 25

*Printz v. United States*, 521 U.S. 898 (1997)..................................................... 11, 26

*Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218 (1947) .................................. 6, 9, 24

*United States v. California*, 921 F.3d 865 (9th Cir. 2019) ............................. *passim*

*United States v. Cruikshank*, 92 U.S. 542 (1875) ......................................................7

*United States v. Morrison*, 529 U.S. 598 (2000) ......................................................7


## *Founding Documents*

The Declaration of Independence (U.S. 1776) ........................................................7

U.S. Const. amend. X.................................................................... 4, 11, 26


## *Statutes and Rules*

8 U.S.C. § 1101 *et seq.*................................................................................4

8 U.S.C. § 1103(a)(11)(B) ...................................................... 4, 9, 10, 11

8 U.S.C. § 1231(g) ............................................................... 4, 9, 10, 12

8 U.S.C. § 1357...............................................................................11

8 U.S.C. § 1373...............................................................................26

Cal. Civ. Code § 1670.9 .....................................................................1

Cal. Gov't Code §§ 7284-7284.10 ........................................................2

Cal. Gov't Code § 7284.2 ............................................................. 2, 28

Colo. Rev. Stat. § 24-76.6-102 ...........................................................2

Colo. Rev. Stat. § 24-76.6-103 ...........................................................2

Conn. Gen. Stat. Ann. § 54-192h..........................................................2

D.C. Code § 24-211.07 ...................................................................1, 2

5 Ill. Comp. Stat. 805/1 *et seq.* .......................................................... 3, 22, 26

5 Ill. Comp. Stat. 805/15 ................................................................ 2, 5, 6

Md. Code Ann., Corr. Servs. § 1-102 ......................................................1

N.J. Stat. Ann. § 30:4-8.16.................................................................1

Or. Rev. Stat. § 181A.820 ..................................................................2

Vt. Stat. Ann. tit. 20, § 4651 ...............................................................2

Wash. Rev. Code § 10.93.160................................................................1

Wash. Rev. Code § 43.10.315................................................................2

Fed. R. App. P. 29(a)(2)....................................................................1

## Executive and Legislative Materials

2021 Ill. Legis. Serv. P.A. 102-234 (S.B. 667)................................. *passim*

Comm. on Judiciary & Pub. Safety, Council of D.C., Report on B23-0501, the
  "Sanctuary Values Amendment Act of 2020" (Nov. 23, 2020) .........................2

H.B. 3265, § 6, 81st Leg. Assemb., 2021 Reg. Sess. (Or. 2021) .............................1

Ill. Gen. Assemb., S. Sess. Transcript for May 31, 2017
  (statement of Sen. Aquino) ...........................................................27

Ill. Gen. Assemb., S. Sess. Transcript for May 31, 2017
  (statement of Sen. J. Cullerton) .......................................................22

Ill. Gen. Assemb., S. Sess. Transcript for May 4, 2017
  (statement of Sen. J. Cullerton) ........................................................4

Ill. Gen. Assemb., S. Sess. Transcript for May 4, 2017
  (statement of Sen. Martinez)...........................................................28

N.J. Off. of Att'y Gen., *Attorney General Law Enforcement Directive No.
  2018-6 v2.0* (revised Sept. 27, 2019)........................................... 2, 23

N.Y. Exec. Chamber, Exec. Order No. 170, *State Policy Concerning Immigrant Access to State Services* (Sept. 15, 2017) ..........................................2

*Oversight of the Administration's Misdirected Immigration Enforcement Priorities: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary*, 114th Cong. 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery County, Maryland, Police Department & President, Major Cities Chiefs Association) ......................................................................................13

## Other Authorities

ACLU, *Freezing Out Justice* (2018)............................................... 15, 16

Lora Adams, Ctr. for Am. Progress, *State and Local Governments Opt Out of Immigrant Detention* (July 2019) ......................................................18

Carlos Ballesteros, *Politicians Condemn Conditions at ICE Detention Center in Kankakee*, Chi. Sun Times (Oct. 10, 2019)............................. 3, 18

Lindsey Bever, *Hispanics 'Are Going Further into the Shadows' Amid Chilling Immigration Debate, Police Say*, Wash. Post (May 12, 2017) ...........16

Brief of Amici Curiae Current & Former Prosecutors & Law Enforcement Leaders & Former Attorneys General & Department of Justice Officials in Support of Defendants-Appellees & for Affirmance, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021) (Nos. 20-2754, 20-2755)...........................................................23

Randy Capps et al., Migration Pol'y Inst., *Revving Up the Deportation Machinery: Enforcement and Pushback Under Trump* (May 2018).................17

Stephanie Casanova, *Hundreds Rally in Chicago for an End to Detentions and a Pathway to Citizenship for Immigrants*, Chi. Tribune (July 8, 2021) .............18

Aaron Chalfin & Justin McCrary, *The Effect of Police on Crime: New Evidence from U.S. Cities, 1960-2010* (Nat'l Bureau of Econ. Research, Working Paper No. 18815, 2013) ................29

Alanna Durkin Richer, *Prosecutors Sue ICE to Stop Courthouse Immigration Arrests*, PBS News Hour (Apr. 29, 2019) ..........................................................23

David Eggert, *Michigan Gov. Whitmer Blocks Immigrant Detention Plan*, AP News (Feb. 19, 2019)..........................................................................1

Alexia Fernández Campbell, *US Police Chiefs are Fighting the Crackdown on "Sanctuary Cities,"* Vox (Aug. 18, 2017).......................................................22

Uriel J. García, *The Number of Undocumented Immigrants in Detention Centers Has Increased by More than 50% Since Biden Took Office*, Texas Trib. (Dec. 2, 2021) .................................................................17

David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L.J. 1 (2006) ............................................................... 19, 20

Elisa Jácome, *The Effect of Immigration Enforcement on Crime Reporting: Evidence from the Priority Enforcement Program* (Stanford Inst. For Econ. Pol'y Rsch. Working Paper, 2021)............................15

Deborah Jones Merritt, *Three Faces of Federalism: Finding a Formula for the Future*, 47 Vand. L. Rev. 1563 (1994) ...........................................8

Christopher N. Lasch et al., *Understanding "Sanctuary Cities,"* 59 B.C. L. Rev. 1703 (2018)........................................................... 16, 19

Letter from Seventy-Five Former State and Federal Judges to Ronald D. Vitiello, Acting Director of ICE (Dec. 12, 2018)..............................................22

Major Cities Chiefs Ass'n, *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies* (June 2006) ......................................................... 20, 21

Elvia Malagón, *Bill Limiting Immigration Detention in Illinois Advances to Governor's Desk*, Chi. Sun Times (June 1, 2021)...............................................18

Silva Mathema, Ctr. for Am. Progress, *Keeping Families Together* (Mar. 16, 2017) ............................................................................2

John O. McGinnis & Ilya Somin, *Federalism vs. States' Rights: A Defense of Judicial Review in a Federal System*, 99 Nw. U. L. Rev. 89 (2004)..................26

Elliott C. McLaughlin & Nicole Chavez, *'Close the Camps': Protestors Across the Country Demand an End to Migrant Detention Centers*, CNN (July 2, 2019).............................................................................17

Robert A. Mikos, *Can the States Keep Secrets From the Federal Government?*, 161 U. Pa. L. Rev. 103 (2012) ............................................ 28, 29

Suzanne Monyak, *State Bills Banning Private Immigration Detention Gain Traction*, Roll Call (May 25, 2021).....................................................17

Pew Rsrch. Ctr., *More Latinos Have Serious Concerns About Their Place in America Under Trump* (Oct. 25, 2018) .............................................................13

Huyen Pham, *The Constitutional Right Not to Cooperate? Local Sovereignty and the Federal Immigration Power*, 74 U. Cin. L. Rev. 1373 (2006)..............27

James Queally, *Fearing Deportation, Many Domestic Violence Victims are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017).......................22

Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018) .................................................. 21, 22, 23

Danyelle Solomon et al., Ctr. for Am. Progress, *The Negative Consequences of Entangling Local Policing and Immigration Enforcement* (Mar. 21, 2017) .................................................................... 14, 29, 30

Nik Theodore, Dep't of Urban Planning & Pol'y, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* (2013) ..............................................................................14

Clifford Ward, *McHenry County Reports Six Cases of Mumps Among Detainees in County Jail This Summer*, Chi. Tribune (Sept. 12, 2019) ........ 3, 18

Seth Freed Wessler, *Fear, Illness and Death in ICE Detention: How a Protest Grew on the Inside*, N.Y. Times (updated June 7, 2021) ...................................17

Chuck Wexler, *Police Chiefs Across the Country Support Sanctuary Cities Because They Keep Crime Down*, L.A. Times (Mar. 6, 2017)...........................21

Tom K. Wong, Ctr. for Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* (Jan. 26, 2017).............................................................30

Tom K. Wong, *Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime*, Wash. Post (Apr. 24, 2018) ........................................14

## INTRODUCTION AND INTEREST OF AMICI

The District of Columbia and the States of California, Connecticut, Delaware, Maine, Maryland, Massachusetts, Minnesota, Nevada, New Jersey, New Mexico, New York, Oregon, Rhode Island, Vermont, and Washington (collectively, "Amici States") file this brief as amici curiae, pursuant to Federal Rule of Appellate Procedure 29(a)(2), in support of the appellee. Millions of immigrants, both documented and undocumented, call the Amici States home. Immigrant communities play an important role not just in states' civic and economic lives, but also in their criminal justice systems, where immigrants' trust and cooperation are vital to ensuring public safety. With the paramount goal of promoting public safety for all residents, the Amici States have adopted different approaches to their involvement in federal immigration enforcement based on state needs, public safety priorities, and available resources.

For example, at least five states and the District of Columbia have enacted measures that prohibit state or local governments from entering into agreements to detain individuals for civil immigration violations, like the Illinois law at issue in this case.[1] Others have limited their involvement in federal immigration detention on a case-by-case basis. *See, e.g.*, David Eggert, *Michigan Gov. Whitmer Blocks*

---

[1]    *See* Cal. Civ. Code § 1670.9; D.C. Code § 24-211.07(a)(4)(A); Md. Code Ann., Corr. Servs. § 1-102; N.J. Stat. Ann. § 30:4-8.16; H.B. 3265, § 6, 81st Leg. Assemb., 2021 Reg. Sess. (Or. 2021); Wash. Rev. Code § 10.93.160(12).

*Immigrant Detention Plan*, AP News (Feb. 19, 2019).[2]  And at least nine states—including Illinois and seven amici states—and the District of Columbia have instituted other kinds of limits on state and local law enforcement officers' involvement with immigration enforcement.[3]  These measures reflect the considered judgments of state lawmakers, who have reasonably determined for their jurisdictions that the "erosion of trust" that can occur when state and local governments become embroiled in federal immigration enforcement "makes the entire community vulnerable because people are fearful of reporting crimes, coming out as witnesses, or reporting domestic violence abuses."  Silva Mathema, Ctr. for Am. Progress, *Keeping Families Together* 6 (Mar. 16, 2017);[4] *see* Cal. Gov't Code § 7284.2(b), (c) (finding that the "trust between California's immigrant community and state and local agencies" is "threatened when state and local agencies are entangled with federal immigration enforcement"); Comm. on Judiciary & Pub. Safety, Council of D.C., Report on Bill 23-0501, the "Sanctuary Values Amendment

---

[2]     *Available at* https://bit.ly/3rQyM2Z.

[3]     *See* Cal. Gov't Code §§ 7284-7284.10; Colo. Rev. Stat. § 24-76.6-102 to -103; Conn. Gen. Stat. Ann. § 54-192h; D.C. Code § 24-211.07; 5 Ill. Comp. Stat. 805/15; N.J. Off. of Att'y Gen., *Attorney General Law Enforcement Directive No. 2018-6 v2.0* (revised Sept. 27, 2019), https://bit.ly/3K8Ck7b; N.Y. Exec. Chamber, Exec. Order No. 170, *State Policy Concerning Immigrant Access to State Services* (Sept. 15, 2017); Or. Rev. Stat. § 181A.820; Vt. Stat. Ann. tit. 20, § 4651; Wash. Rev. Code § 43.10.315.

[4]     *Available at* https://bit.ly/34H9tb5.

Act of 2020," at 4 (Nov. 23, 2020) ("[I]mmigrant communities in the District fear and avoid interactions with the police because they believe the police will enforce immigration policies and potentially detain or deport someone they love.").[5]

Like those other jurisdictions, Illinois determined that disentangling itself and its political subdivisions from federal immigration enforcement would best serve the needs of its residents. Ending the use of state and local facilities for civil immigration detention is an important component of this effort, not least because the conditions in Illinois facilities used for this purpose have become a flashpoint and significant potential driver of dysfunction between Illinois law enforcement and immigrant communities. *See, e.g.*, Carlos Ballesteros, *Politicians Condemn Conditions at ICE Detention Center in Kankakee*, Chi. Sun Times (Oct. 10, 2019);[6] Clifford Ward, *McHenry County Reports Six Cases of Mumps Among Detainees in County Jail This Summer*, Chi. Tribune (Sept. 12, 2019).[7] The Illinois Way Forward Act, 2021 Ill. Legis. Serv. P.A. 102-234 (S.B. 667), (the "Act") is itself an amendment to the Illinois TRUST Act, 5 Ill. Comp. Stat. 805/1 *et seq.*, a law designed, in the words of primary sponsor Sen. John Cullerton, "to foster trust between police and immigrant communities and refocus resources on fighting

---

[5]     *Available at* https://bit.ly/3LISyWi.

[6]     *Available at* https://bit.ly/36dKAUB.

[7]     *Available at* https://bit.ly/3JA0Ai4.

priority crimes," Ill. Gen. Assemb., S. Sess. Transcript for May 4, 2017, at 118-19 (statement of Sen. J. Cullerton).[8] By challenging Illinois's authority to pass the Act, this lawsuit threatens the sovereign interests of all the Amici States.

The Amici States rely on their historic police powers to implement policies that maintain trust, facilitate cooperation, and protect all residents by promoting positive relationships between state and local government—in particular law enforcement officers—and the communities they serve. And these policies are reinforced by recent studies that confirm that there are public safety benefits to fostering independence between local law enforcement and federal immigration enforcement. *See* Part I.A.2.a, *infra*. In addition, the Act does not conflict with the Immigration and Nationality Act ("INA"), 8 U.S.C. § 1101 *et seq.*, or 8 U.S.C. §§ 1103(a)(11)(B) and 1231(g), in particular. Nor does federal immigration law preempt the Act as a matter of field preemption. Further, any interpretation of Sections 1103(a)(11)(B) or 1231(g) that would require Illinois to contract to house civil immigration detainees would violate the anticommandeering rule of the Tenth Amendment. Accordingly, the Act is an appropriate exercise of Illinois's sovereign authority and is not preempted by federal immigration law.

---

[8]     *Available at* https://bit.ly/34ND9TF.

## ARGUMENT

**I.     Federal Immigration Law Does Not Preempt The Act.**

    **A.     The Act does not stand as an obstacle to the implementation of federal immigration law.**

Under the doctrine of obstacle preemption, federal law impliedly preempts state law when the state law "stands as an obstacle to the accomplishment and execution of the full purposes and objectives of Congress." *Hines v. Davidowitz*, 312 U.S. 52, 67 (1941). The possibility of implied preemption, however, "does not justify a 'freewheeling judicial inquiry into whether a state statute is in tension with federal objectives,'" for "such an endeavor 'would undercut the principle that it is Congress rather than the courts that pre-empts state law.'" *Chamber of Com. of U.S. v. Whiting*, 563 U.S. 582, 607 (2011) (plurality opinion) (quoting *Gade v. Nat'l Solid Wastes Mgmt. Ass'n*, 505 U.S. 88, 111 (1992) (Kennedy, J., concurring in part and concurring in judgment)). Rather, courts impose a "high threshold" for "a state law . . . to be preempted for conflicting with the purposes of a federal Act." *Id.* (quoting *Gade*, 505 U.S. at 110).

In this case, the Counties of McHenry and Kankakee contend that two related provisions of the Act run afoul of federal immigration law. First, the Act prohibits "any unit of state or local government" from "enter[ing] into or renew[ing] any contract, intergovernmental service agreement, or any other agreement to house or detain individuals for federal civil immigration violations." 5 Ill. Comp. Stat.

805/15(g)(1).  Second, the Act requires any state or local government entity with such an agreement to terminate it by January 1, 2022.  *Id.* 805/15(g)(2).

The Counties assert that these provisions "stand[] as an obstacle to the execution of the full purposes of Congress" in the immigration domain because they "foreclose[] the Attorney General" from "us[ing] local detention facilities" for civil immigration detention.  Br. 21.  But the federal statutes relied on by the Counties in no way require state and local governments to make detention facilities available to the federal government for civil immigration detention.  Moreover, applying preemption is particularly disfavored where, as here, a state is exercising its prerogative over the public safety of its residents.

1.    Congress expressed no "clear and manifest purpose" to override the historic right of states to limit their assistance with federal immigration enforcement.

Where obstacle preemption is at issue, "[w]hat is a sufficient obstacle is a matter of judgment, to be informed by examining the federal statute as a whole and identifying its purpose and intended effects."  *Crosby v. Nat'l Foreign Trade Council*, 530 U.S. 363, 373 (2000).  The analysis "begin[s] . . . 'with the assumption that the historic police powers of the States [are] not to be superseded by the Federal Act unless that was the clear and manifest purpose of Congress,'" *Altria Grp., Inc. v. Good*, 555 U.S. 70, 77 (2008) (alteration in original) (quoting *Rice v. Santa Fe Elevator Corp.*, 331 U.S. 218, 230 (1947)), an assumption that "applies with

6

particular force when Congress has legislated in a field traditionally occupied by the States," *id.* at 77.

There is "no better example of the police power, which the Founders denied the National Government and reposed in the States, than the suppression of violent crime and vindication of its victims." *United States v. Morrison*, 529 U.S. 598, 618 (2000). Since the States "entered into the Union," their "very highest duty" has been "to protect all persons within their boundaries in the enjoyment of the[] 'unalienable rights'" of "life and personal liberty." *United States v. Cruikshank*, 92 U.S. 542, 553 (1875) (quoting The Declaration of Independence para. 2 (U.S. 1776)). It follows that state and local governments are in the best position to determine how to allocate limited resources to best serve the public safety needs of their communities. *See Hillsborough County v. Automated Med. Lab'ys, Inc.*, 471 U.S. 707, 719 (1985) ("[T]he regulation of health and safety matters is primarily, and historically, a matter of local concern."). Thus, "[t]he promotion of safety of persons and property is unquestionably at the core of the State's police power." *Kelley v. Johnson*, 425 U.S. 238, 247 (1976).

The Act falls squarely within Illinois's historic police power. The authority to involuntarily detain individuals—or to decline to do so—is a core component of state law enforcement power, *see United States v. California*, 921 F.3d 865, 885-86 (9th Cir. 2019), and the Act is indisputably an exercise of that authority. More

7

broadly, the Act reflects a policy judgment that Illinois can more effectively ensure the safety and welfare of its citizens if it removes itself from the federal civil immigration detention apparatus. Courts have repeatedly affirmed that policy judgments such as these fall within states' traditional police powers. *See, e.g.*, *id.* (recognizing that "the general authority to ensure the health and welfare of inmates and detainees in facilities within its borders" is part of a state's "historic police powers" (quoting *Arizona v. United States*, 567 U.S. 387, 400 (2012))); *City of Chicago v. Barr*, 961 F.3d 882, 891-92 (7th Cir. 2020) (recognizing that a state is "exercising its police power" when it "decid[es] that its law enforcement needs would be better met" if it disentangled itself from federal immigration enforcement).

Because "the police power is controlled by 50 different States instead of one national sovereign, the facets of governing that touch on citizens' daily lives are normally administered by smaller governments closer to the governed." *Nat'l Fed'n of Indep. Bus. v. Sebelius* (*NFIB*), 567 U.S. 519, 536 (2012). This decentralized system—i.e., "federalism"—"secures to citizens the liberties that derive from the diffusion of sovereign power." *New York v. United States*, 505 U.S. 144, 181 (1992) (quoting *Coleman v. Thompson*, 501 U.S. 722, 759 (1991) (Blackmun, J., dissenting)). In a "nation composed of diverse racial, cultural, and religious groups, this opportunity to express multiple social values is essential." Deborah Jones Merritt, *Three Faces of Federalism: Finding a Formula for the Future*, 47 Vand. L.

Rev. 1563, 1574 (1994).  For these reasons, "'it is incumbent upon the federal courts to be certain of Congress' intent before finding that federal law overrides' the 'usual constitutional balance of federal and state powers.'"  *Bond v. United States*, 572 U.S. 844, 858 (2014) (quoting *Gregory v. Ashcroft*, 501 U.S. 452, 460 (1991)).

Especially in light of the traditional state powers at play, the Counties have not met the high threshold of demonstrating that Congress's "clear and manifest purpose" was to preempt state laws like the Act.  *Altria Grp., Inc.*, 555 U.S. at 77 (quoting *Rice*, 331 U.S. at 230).

To start, despite the Counties' intimations to the contrary, *see* Br. 16-22, the INA "direct[s] *federal* activities, not those of state or local governments," *California*, 921 F.3d at 887.  In *California*, the Ninth Circuit recognized that "the provisions of the INA that permit the federal government to contract with states and localities for detention purposes" do not "demonstrate *any* intent, let alone 'clear and manifest,' that Congress intended to supersede" state authority regarding the well-being of detainees in facilities "within [state] borders."  921 F.3d at 886 (citing 8 U.S.C. §§ 1103(a)(11)(B), 1231(g)).  The same is true here.  Indeed, the INA provisions at issue in this case are the same as were considered in *California*, and they do not require states to do anything at all.  Section 1103(a)(11)(B) "authorize[s]" the Attorney General "to enter into a *cooperative agreement*" with any state or political subdivision "which *agrees* to provide" facilities for immigration detention.  8 U.S.C.

9

§ 1103(a)(11)(B) (emphasis added). If anything is clear and manifest from this provision authorizing the formation of "cooperative agreement[s]," it is not that states have been divested of their authority to decide whether to involve themselves or their political subdivisions in federal immigration enforcement; it is the opposite. *Id.* Likewise, Section 1231(g) requires the Attorney General to "arrange for appropriate places of detention for aliens detained pending removal or a decision on removal." It makes no mention of states, much less state obligations.

For this reason, the Counties miss the mark by objecting that, because the INA "authorizes agreements with local governments for the housing of detainees" and "authorize[s] the Attorney General to use local government detention facilities," Illinois may not "foreclose[] the Attorney General from doing so." Br. 21. The INA's text provides no support for the view that its authorization of federal action constitutes an ineluctable command to the states. If Congress had wanted to empower the Attorney General to make offers states could not refuse, it would have said so clearly; indeed, it would have been required to say so clearly, given the extraordinary intrusion into state law enforcement prerogatives this would represent. *See Arizona*, 567 U.S. at 400. Thankfully for the preservation of states' core police powers—and the constitutionality of the INA, *see* Part II, *infra*—Congress took a more permissive approach. "In short," the Act "does not directly conflict with any

obligations that the INA . . . impose[s] on state or local governments, because federal law does not actually mandate any state action." *California*, 921 F.3d at 887.

The voluntary nature of Section 1103(a)(11)(B) is consistent with other INA provisions that authorize cooperation between the federal government and states but do not require any state cooperation with federal immigration enforcement. *See, e.g.*, 8 U.S.C. § 1357(g)(10)(B) (authorizing a state or political subdivision "to cooperate with the Attorney General in the identification, apprehension, detention, or removal of aliens not lawfully present in the United States"); *City of El Cenizo v. Texas*, 890 F.3d 164, 178 (5th Cir. 2018) ("Section 1357 does not require cooperation at all."). If anything, provisions like these that permit *voluntary* state cooperation underscore Congress's understanding that such cooperation should not, and indeed cannot, be mandated. *See Printz v. United States*, 521 U.S. 898, 917-18 (1997) (recognizing "two centuries of apparent congressional avoidance of the practice" of "requir[ing] the participation of state or local officials in implementing federal regulatory schemes"); *California*, 921 F.3d at 891 ("[T]he federal government was free to *expect* as much [cooperation with federal immigration authorities] as it wanted, but it could not *require* California's cooperation without running afoul of the Tenth Amendment."); *see also* Part II, *infra*. Because "it is a state's historic police power—not preemption—that we must assume, unless clearly

superseded by federal statute," the Counties have not made the requisite showing for obstacle preemption. *California*, 921 F.3d at 887.

Nor does the Act obstruct in practice the federal government's ability to detain individuals for civil immigration violations. The federal government may construct or purchase its own facilities or lease those of private entities. *See* 8 U.S.C. § 1231(g) (contemplating the use of "United States government facilities," conferring power on the Attorney General to use federal funds to "acquire, build, remodel, [and] repair" additional facilities as necessary, and requiring consideration of the "purchase or lease of . . . existing prison, jail, detention center, or other comparable facilit[ies]" before new facilities are constructed). The use of state and local facilities is merely one option among many and an option explicitly subject to the "agreement" of states. Indeed, because federal law permits states and their political subdivisions to choose not to enter into any such agreement, the Act's exercise of that choice cannot be an obstacle to federal law.

> 2. States like Illinois have reasonably exercised their police powers to disentangle local law enforcement from federal immigration enforcement.

States like Illinois—including many of the Amici States—have reasonably concluded that separating local law enforcement from federal immigration enforcement, including immigration detention, improves public health and safety.

a.    Law enforcement cannot succeed without the trust of the community, and participation in immigration enforcement undermines such trust.

As the entities with "primary authority for defining and enforcing the criminal law," *Engle v. Isaac*, 456 U.S. 107, 128 (1982), states have long understood that "the trust and respect" of the community is essential to effective law enforcement, *Oversight of the Administration's Misdirected Immigration Enforcement Priorities: Examining the Impact of Public Safety and Honoring the Victims: Hearing Before the S. Comm. on the Judiciary*, 114th Cong. 2 (July 21, 2015) (statement of Tom Manger, Chief, Montgomery County, Maryland, Police Department & President, Major Cities Chiefs Association).  Stopping and solving crime requires the "full cooperation of victims and witnesses," and victims and witnesses who do not trust the police, prosecutors, or their state or local governments are unlikely to be cooperative.  *Id.*

Fears about immigration enforcement depress immigrant communities' trust in and cooperation with law enforcement.  Anxiety about deportation and the detention that precedes it is widespread: a 2018 Pew survey indicated that 66 percent of Hispanic immigrants worry about their own removal or that of family members or friends.  Pew Rsrch. Ctr., *More Latinos Have Serious Concerns About Their Place in America Under Trump* (Oct. 25, 2018).[9]   Unsurprisingly, when communities

---

[9]      *Available at* https://pewrsr.ch/3I0xPe8.

associate state and local law enforcement with the prospect of detention and removal, they are less likely to engage with law enforcement.  *See* Danyelle Solomon et al., Ctr. for Am. Progress, *The Negative Consequences of Entangling Local Policing and Immigration Enforcement* 3 (Mar. 21, 2017).[10]

Empirical evidence bears out this common-sense conclusion: a 2013 study by the University of Illinois at Chicago found that "the greater involvement of police in immigration enforcement has significantly heightened the fears many Latinos have of the police," which, "in turn, has led to a reduction in public safety."  Nik Theodore, Dep't of Urban Planning & Pol'y, Univ. of Ill. at Chi., *Insecure Communities: Latino Perceptions of Police Involvement in Immigration Enforcement* 18 (2013).[11]  Roughly 45 percent of Latinos surveyed stated that they were "less likely to contact police officers if they have been the victim of a crime" or "to voluntarily offer information about crimes" "because they fear that police officers will ask them or someone they know about their immigration status."  *Id.* at 6.  A survey of undocumented individuals in San Diego similarly found that respondents would be approximately 61 percent less likely to report a crime they witnessed and approximately 43 percent less likely to report being victims of crime if they knew that local law enforcement worked together with ICE.  Tom K. Wong,

---

[10]    *Available at* https://bit.ly/3sJ97Zf.

[11]    *Available at* https://bit.ly/3LCob3F.

*Sanctuary Cities Don't 'Breed Crime.' They Encourage People to Report Crime*, Wash. Post (Apr. 24, 2018);[12] *see also* Elisa Jácome, *The Effect of Immigration Enforcement on Crime Reporting: Evidence from the Priority Enforcement Program* 3-4 (Stanford Inst. For Econ. Pol'y Rsch. Working Paper, 2021)[13] (finding that the Department of Homeland Security's Priority Enforcement Program, under which the agency "no longer sought to detain individuals with immigration offenses alone, and instead only focused on detaining individuals convicted of significant criminal offenses" increased crime reporting by Hispanic complainants by four percent).

Immigrant communities are well aware of immigration enforcement policies and shape their behavior toward law enforcement accordingly.  As immigration arrests in 2017 "soared by 30 percent from the 2016 fiscal year," a national survey of police officers correspondingly "reported the most dramatic drop in outreach from and cooperation with immigrant and limited English proficiency . . . communities over the past year."  ACLU, *Freezing Out Justice: How Immigration Arrests at Courthouses Are Undermining the Justice System* 1 (2018).[14]  Specifically, many police officers "reported that immigrants were less likely in 2017 than in 2016 to be willing to make police reports," "help in investigations," or "work with prosecutors."

---

[12]     *Available at* https://wapo.st/3GZNI38.

[13]     *Available at* https://bit.ly/3p9kCbD.

[14]     *Available at* https://bit.ly/3sMybyD.

*Id.*  As a result, law enforcement officials reported that crimes such as domestic violence, human trafficking, and sexual assault "have become more difficult to investigate."  *Id.*  Further, police officers reported that this "lack of trust and cooperation" had adverse impacts on "their ability to protect crime survivors" and on "officer safety."  *Id.*

These trends have also played out in jurisdictions across the country with large immigrant populations, which saw a steep drop in crime reporting at the same time as immigration arrests escalated.  In the first three months of 2017, the Houston Police Department reported "a 13 percent decrease in violent crime reporting by Hispanics," including a "43 percent drop in the number of Hispanics reporting rape and sexual assault."  Lindsey Bever, *Hispanics 'Are Going Further Into the Shadows' Amid Chilling Immigration Debate, Police Say*, Wash. Post (May 12, 2017).[15]  Similarly, the Los Angeles Police Department reported "a nearly 10 percent drop from [2016] in the reporting of spousal abuse and a 25 percent drop in the reporting of rape among Hispanic communities."  *Id.*  The department concluded that "deportation fears may be preventing Hispanic members of the community from reporting when they are victimized."  Christopher N. Lasch et al., *Understanding "Sanctuary Cities,"* 59 B.C. L. Rev. 1703, 1762 (2018) (internal quotation marks

---

[15]     *Available at* https://bit.ly/3GUBTeK.

omitted).  From January through May 2017, relative to the same period in 2016, the Salt Lake City Police Department "received 12.9 percent fewer reports of criminal activity in Latino neighborhoods," as compared with only 1.4 percent fewer reports citywide.  Randy Capps et al., Migration Pol'y Inst., *Revving Up the Deportation Machinery: Enforcement and Pushback Under Trump* 69 (May 2018).[16]

The use of state and local facilities for civil immigration detention is a highly public form of law enforcement participation in federal immigration enforcement and one likely to sow distrust in the community.  For years, the federal system of immigration detention—in particular conditions of confinement—has been a controversial topic garnering national attention.  *See, e.g.*, Seth Freed Wessler, *Fear, Illness and Death in ICE Detention: How a Protest Grew on the Inside*, N.Y. Times (updated June 7, 2021);[17] Elliott C. McLaughlin & Nicole Chavez, *'Close the Camps': Protestors Across the Country Demand an End to Migrant Detention Centers*, CNN (July 2, 2019).[18]  The combination of a surge in the number of individuals held in immigration detention, *see* Uriel J. García, *The Number of Undocumented Immigrants in Detention Centers Has Increased by More than 50%*

---

[16]     *Available at* https://bit.ly/3H2qPfG.

[17]     *Available at* https://nyti.ms/3I8GEm0.

[18]     *Available at* https://cnn.it/3oW5SMZ.

*Since Biden Took Office*, Texas Trib. (Dec. 2, 2021),[19] and well-publicized incidents of abuse and neglect in detention facilities has increased the focus on state and local involvement in such detention, *see, e.g.*, Lora Adams, Ctr. for Am. Progress, *State and Local Governments Opt Out of Immigrant Detention* (July 2019);[20] Suzanne Monyak, *State Bills Banning Private Immigration Detention Gain Traction*, Roll Call (May 25, 2021).[21]   Illinois itself has repeatedly been at the center of such controversy.  Ballesteros, *supra*; Ward, *supra*; Stephanie Casanova, *Hundreds Rally in Chicago for an End to Detentions and a Pathway to Citizenship for Immigrants*, Chi. Tribune (July 8, 2021);[22] Elvia Malagón, *Bill Limiting Immigration Detention in Illinois Advances to Governor's Desk*, Chi. Sun Times (June 1, 2021).[23]

Illinois thus had ample grounds to conclude that ongoing participation in civil immigration detention did not promote the safety of its citizens.  Cooperation with immigration enforcement in such a contentious context inevitably causes state and local law enforcement authorities to become associated with immigration detention and its controversies in the minds of community members.  Indeed, there is a natural perception that a civil immigration detainee held at a state or local government

---

[19]   *Available at* https://bit.ly/3sRQvpW.

[20]   *Available at* https://ampr.gs/33wfUNy.

[21]   *Available at* https://bit.ly/3sLYPaP.

[22]   *Available at* https://bit.ly/3gWw6ug.

[23]   *Available at* https://bit.ly/3uWBDJJ.

facility is held there *under the authority of* that state or local government.  *Cf. New York*, 505 U.S. at 169 ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials who devised the regulatory program may remain insulated from the electoral ramifications of their decision.").  This in turn sows skepticism and mistrust.  It was reasonable for the Illinois legislature to make the policy judgment that disassociating law enforcement from immigration detention would help police and prosecutors achieve their fundamental mission of suppressing crime and bringing offenders to justice.

> b.    Recognizing the imperatives of trust and cooperation, members of the law enforcement community have for decades advocated separating law enforcement and immigration enforcement.

Because community mistrust is antithetical to effective policing, law enforcement officers have been early and consistent advocates for reducing the participation of states and localities in immigration enforcement. When the campaign to "involve local police in federal immigration enforcement" emerged in the 1990s and "intensified after the September 11th terrorist attacks," Lasch, *supra*, at 1722, "[b]y far, the most frequent and impassioned objection" to this new push "came from state and local police concerned [about] their own effectiveness," David A. Harris, *The War on Terror, Local Police, and Immigration Enforcement: A Curious Tale of Police Power in Post-9/11 America*, 38 Rutgers L.J. 1, 37 (2006).

Police officers "wanted no part of immigration enforcement because they knew that taking on this task would undermine their ability to keep the public safe." *Id.*

In 2006, a group of police chiefs and sheriffs from the 69 largest law enforcement agencies in the United States issued a statement warning that "[i]mmigration enforcement by local police would likely negatively [a]ffect and undermine the level of trust and cooperation between local police and immigrant communities." Major Cities Chiefs Ass'n, *M.C.C. Immigration Committee Recommendations for Enforcement of Immigration Laws by Local Police Agencies* 6 (June 2006).[24]  The police chiefs reasoned that local entanglement with federal immigration enforcement would discourage both documented and undocumented immigrants from contacting or cooperating with the police for "fear that they themselves or undocumented family members or friends may become subject to immigration enforcement." *Id.*  And, the police chiefs cautioned, "[w]ithout assurances that contact with the police would not result in purely civil immigration enforcement action, the hard won trust, communication and cooperation from the immigrant community would disappear." *Id.*  Further entanglement between local officials and federal immigration enforcement would "result in increased crime against immigrants and in the broader community, create a class of silent victims

---

[24]     *Available at* https://bit.ly/3HxyItD.

and eliminate the potential for assistance from immigrants in solving crimes or preventing future terroristic acts." *Id.*  As explained in Part I.A.2.a, *supra*, these predictions were prescient.

In response to more recent escalations in immigration arrests, detentions, and deportations, police officers have reiterated these concerns.  Chuck Wexler, Executive Director of the Police Executive Research Forum and a former leader in the Boston Police Department, has argued that "[p]olice chiefs across the country support" policies separating law enforcement and immigration enforcement, because such policies "keep crime down."  Chuck Wexler, *Police Chiefs Across the Country Support Sanctuary Cities Because They Keep Crime Down*, L.A. Times (Mar. 6, 2017).[25]  Based on his "decade . . . spent exploring the role of local police in immigration issues," Wexler has observed that "police chiefs warn that if their agencies are required to enforce federal immigration laws, it will hurt their ability to investigate and solve serious crimes in their communities." *Id.*  Consistent with this observation, Houston Police Chief Art Acevedo has criticized immigration arrests at courthouses, noting that "[i]f you lose witnesses, everyone else's crime goes up." Hannah Rappleye et al., *Immigration Crackdown Makes Women Afraid to Testify Against Abusers, Experts Warn*, NBC News (Sept. 22, 2018).[26]  Austin Police Chief

---

[25]     *Available at* https://lat.ms/3BoPRUZ.

[26]     *Available at* https://nbcnews.to/3uVFK8J.

Brian Manley has similarly explained that "[c]riminals understand" immigrant communities' lack of trust in police and "feel emboldened to commit crimes against the immigrant community without fear of being held accountable because they know they won't call police." Alexia Fernández Campbell, *US Police Chiefs are Fighting the Crackdown on "Sanctuary Cities,"* Vox (Aug. 18, 2017).[27] Police leaders across the country have expressed similar sentiments. *See, e.g.*, James Queally, *Fearing Deportation, Many Domestic Violence Victims are Steering Clear of Police and Courts*, L.A. Times (Oct. 9, 2017);[28] Rappleye et al., *supra*.[29]

Prosecutors and judges have also criticized the enmeshment of law enforcement and immigration enforcement. In 2018, 75 former state and federal judges wrote to the Acting Director of ICE to object to the practice of immigration arrests at courthouses. Letter from Seventy-Five Former State and Federal Judges to Ronald D. Vitiello, Acting Director of ICE (Dec. 12, 2018).[30] Prosecutors have likewise criticized courthouse arrests for having a "chilling effect on witnesses,"

---

[27]     *Available at* https://bit.ly/3Jvz7y4.

[28]     *Available at* https://lat.ms/3JC9fR1.

[29]     The Illinois TRUST Act, the Illinois Way Forward Act's predecessor statute, itself garnered the support or neutrality of the "[Illinois] Chiefs of Police, the Fraternal Order of Police, the Sheriffs' Association, and the Illinois State Police." Ill. Gen. Assemb., S. Sess. Transcript for May 31, 2017, at 97 (statement of Sen. J. Cullerton), https://bit.ly/34LqnoQ.

[30]     *Available at* https://bit.ly/3I2DS1T.

Rappleye et al., *supra*, and some have even sued to stop the practice, Alanna Durkin Richer, *Prosecutors Sue ICE to Stop Courthouse Immigration Arrests*, PBS News Hour (Apr. 29, 2019).[31]  In 2018, New Jersey's Attorney General issued a directive limiting the cooperation of state law enforcement officials with federal immigration enforcement more generally because he had determined that the federal government's "increasing[] reli[ance] on state and local law enforcement agencies to enforce federal civil immigration law . . . present[ed] significant challenges to New Jersey's law enforcement officers."  N.J. Off. of Att'y Gen., *Attorney General Law Enforcement Directive No. 2018-6 v2.0* (revised Sept. 27, 2019).[32]  And over 50 former prosecutors and state attorneys general have joined briefs in cases much like this one, because "successful prosecutorial efforts are undermined when undocumented immigrants and their communities fear interacting with law enforcement and the justice system."  Brief of Amici Curiae Current & Former Prosecutors & Law Enforcement Leaders & Former Attorneys General & Department of Justice Officials in Support of Defendants-Appellees & for Affirmance, at 1, *Ocean Cnty. Bd. of Comm'rs v. Att'y Gen. of N.J.*, 8 F.4th 176 (3d Cir. 2021) (Nos. 20-2754, 20-2755).

---

[31]    *Available at* https://abcn.ws/3JwazFh.

[32]    *Available at* https://bit.ly/3K8Ck7b.

Under their traditional and historic police power, "States have broad authority to enact legislation for the public good." *Bond*, 572 U.S. at 854. Many states have concluded, based on empirical studies, expert analysis, and anecdotal evidence, that laws like the Act promote public health and safety. The Act is an exercise of Illinois's police power, directing the use of detention facilities in Illinois in a manner that increases, rather than threatens, public safety. The Counties have not met the "high threshold" needed to establish that Congress's "clear and manifest purpose" was to prohibit such an exercise of police power. *Altria Grp., Inc.*, 555 U.S. at 77 (quoting *Rice*, 331 U.S. at 230).

**B.     For these same reasons, the Act is not field preempted by federal immigration law.**

"[T]he basic premise of field preemption" is that "States may not enter, in any respect, an area the Federal Government has reserved for itself." *Arizona*, 567 U.S. at 402. The Amici States do not dispute that the federal government, by virtue of its "broad, undoubted power over the subject of immigration," *id.* at 394, and pervasive regulation of certain aspects of it, has reserved for itself categories of regulation dealing with immigration, *see, e.g.*, *id.* at 401; *Hines*, 312 U.S. at 73-74. At the same time, "[f]ederalism, central to the constitutional design, adopts the principle that *both* the National and State Governments have elements of sovereignty the other is bound to respect." *Arizona*, 567 U.S. at 398 (emphasis added). As in the obstacle preemption context, "courts should hesitate to infer field preemption unless plaintiffs

show 'that complete ouster of state power including state power to promulgate laws not in conflict with federal laws was the clear and manifest purpose of Congress.'" *City of El Cenizo*, 890 F.3d at 176 (some internal quotation marks omitted) (quoting *De Canas v. Bica*, 424 U.S. 351, 357 (1976)). This is especially so when the state power at issue is as fundamental and historically rooted as is the law enforcement power. *See* Part I.A.1, *supra*.

Sweeping though federal immigration regulation may be, it has never been understood to eliminate states' basic law enforcement discretion simply because the exercise of that discretion may at times intersect with immigration enforcement. *See, e.g.*, *City of El Cenizo*, 890 F.3d at 178; *Ocean Cnty. Bd. of Comm'rs*, 8 F.4th at 181-82. This discretion extends to the law enforcement decision whether to assist federal immigration enforcement efforts, including whether to hold immigration detainees. *See City of El Cenizo*, 890 F.3d at 178 ("Federal law does not suggest the intent— let alone a 'clear and manifest' one—to prevent states from regulating *whether* their localities cooperate in immigration enforcement."). The Counties simply fail to identify a clear and manifest intent of Congress to "preempt[] the field of detaining and housing aliens" such that states have lost even the basic discretion whether to authorize their political subdivisions to enter into detention contracts with the federal government. Br. 18. Such discretion remains under the INA. And as explained in Part II, *infra*, the Constitution's anticommandeering rule requires no less.

## II.  Alternatively, Interpreting The INA To Preempt The Act Would Amount To Unconstitutional Commandeering.

Even if the INA could be read to preempt the Act, such an interpretation would "run[] directly afoul of the Tenth Amendment and the anticommandeering rule." *California*, 921 F.3d at 888.  The anticommandeering doctrine is "the expression of a fundamental structural decision incorporated into the Constitution, i.e., the decision to withhold from Congress the power to issue orders directly to the States." *Murphy v. NCAA*, 138 S. Ct. 1461, 1475 (2018).  Commandeering "undermine[s] federalism by undercutting a state's ability to pursue its own policies," John O. McGinnis & Ilya Somin, *Federalism vs. States' Rights: A Defense of Judicial Review in a Federal System*, 99 Nw. U. L. Rev. 89, 119 (2004), and the Supreme Court has recognized that "such commands are fundamentally incompatible with our constitutional system of dual sovereignty," *Printz*, 521 U.S. at 935.  This Court has experience construing statutes in similar contexts so as to avoid anticommandeering concerns.  *City of Chicago*, 961 F.3d at 898-909 (interpreting a federal grant program so as to not require compliance with a provision of federal immigration law, 8 U.S.C. § 1373, that requires certain state and local cooperation with federal immigration enforcement and that, had it been applicable, would have raised anticommandeering concerns).

The construction of the INA urged by the Counties would create the very harms that the anticommandeering rule aims to prevent.  That rule "promotes

26

political accountability" by making it clear to voters "who[m] to credit or blame" for governmental action.  *Murphy*, 138 S. Ct. at 1477; *see New York*, 505 U.S. at 169 ("[W]here the Federal Government directs the States to regulate, it may be state officials who will bear the brunt of public disapproval, while the federal officials . . . remain insulated.").  Indeed, state and local governments often enact laws like the Act specifically because they "want to signal" to their "local constituencies that they are not working together [with the federal government] to the same end of immigration law enforcement."  Huyen Pham, *The Constitutional Right Not to Cooperate?  Local Sovereignty and the Federal Immigration Power*, 74 U. Cin. L. Rev. 1373, 1380 (2006) (alteration in original) (internal quotation marks omitted).

Illinois legislators expressed these very concerns when considering the Illinois TRUST Act, the legislation that the Act amended.  One co-sponsor noted that immigration enforcement was a matter to be handled "on the federal level," whereas "our police here in our State . . . and in our cities . . . should be dealing with issues that . . . do not deal with immigration."  Ill. Gen. Assemb., S. Sess. Transcript for May 31, 2017, at 96-97 (statement of Sen. Aquino).[33]  Another explained that immigration enforcement "is a federal issue" that "should not be . . . mixed

---

[33]    *Available at* https://bit.ly/34LqnoQ.

with . . . regular law enforcement," and that the Act sought to appropriately separate the two. Ill. Gen. Assemb., S. Sess. Transcript for May 4, 2017, at 127 (statement of Sen. Martinez).[34] Other jurisdictions have reached similar conclusions. *See, e.g.*, Cal. Gov't Code § 7284.2(d) ("Entangling state and local agencies with federal immigration enforcement programs . . . blurs the lines of accountability between local, state, and federal governments."). If Congress prohibits these jurisdictions from limiting their assistance with immigration enforcement, it effectively forces them "to advance objectionable . . . federal policies," and "there is a real danger that citizens will denounce the [state] official[s] for being complicit in federal [immigration] enforcement." Robert A. Mikos, *Can the States Keep Secrets from the Federal Government?*, 161 U. Pa. L. Rev. 103, 130 (2012).

The anticommandeering rule also "prevents Congress from shifting the costs of regulation to the States." *Murphy*, 138 S. Ct. at 1477. While the Counties may derive short-term financial benefits from charging the federal government for detention space, the true costs of participating in federal immigration enforcement—not just to the Counties, but to Illinois more broadly—are nevertheless significant. Begin with the financial, human, and societal costs of less effective law enforcement. As explained, law enforcement "frequently depend[s] on cooperation from private

---

[34]    *Available at* https://bit.ly/34ND9TF.

citizens—crime victims, witnesses, etc.," and these individuals "may be less forthcoming" if they associate law enforcement with immigration enforcement. Mikos, *supra*, at 123. When immigrants are less willing to share information, states must "employ more government agents" to investigate, which compels states to further "absorb some of the financial costs of enforcing federal law that should be borne by the federal government instead." *Id.* at 126, 160. States that do not, or cannot, expend those additional resources must bear the costs associated with a rise in crime. *See* Aaron Chalfin & Justin McCrary, *The Effect of Police on Crime: New Evidence from U.S. Cities, 1960-2010*, at 42 (Nat'l Bureau of Econ. Rsch., Working Paper No. 18815, 2013) (estimating that crime costs residents of high-crime cities anywhere from 5 to 34 percent of their annual income).[35] Thus by "mak[ing] it more difficult for states to gather information in the first instance," the "threat of commandeering" imposes additional costs, Mikos, *supra*, at 121, even if those costs do not show up as directly on state and local balance sheets as do payments from the federal government.

State involvement in immigration enforcement has other costs as well. Immigration enforcement, including detention, often leads to litigation that states and their political subdivisions must expend resources to defend. *See* Solomon et

---

[35]     *Available at* https://bit.ly/33rVq8D.

al., *supra*, at 5. A "growing body of lawsuits that have resulted in court judgments and hefty settlements" has been one reason why jurisdictions have separated local law enforcement from immigration enforcement, seeking to insulate themselves from the threat of legal liability. *Id.* There is also evidence of a connection between state and local participation in immigration enforcement and weaker economic performance in a jurisdiction more generally. *See* Tom K. Wong, Ctr. for Am. Progress, *The Effects of Sanctuary Policies on Crime and the Economy* 7-10 (Jan. 26, 2017).[36]

By striking a "healthy balance of power between the States and the Federal Government," the anticommandeering rule reduces "the risk of tyranny and abuse from either front." *Murphy*, 138 S. Ct. at 1477 (quoting *New York*, 505 U.S. at 181-82). To that end, "the Constitution has never been understood to confer upon Congress the ability to require the States to govern according to Congress' instructions." *NFIB*, 567 U.S. at 577 (quoting *New York*, 505 U.S. at 162). That understanding is no different in the immigration context. Laws like the Act take reasonable steps to disentangle local law enforcement from federal immigration enforcement in order to preserve trust between state and local governments and the immigrant communities they serve. The Constitution guarantees Illinois and the

---

[36]     *Available at* https://bit.ly/3Ia0EF6.

Amici States the sovereign "right, pursuant to the anticommandeering rule, to refrain from assisting with federal efforts."  *California*, 921 F.3d at 891.

## CONCLUSION

The Court should affirm the district court's judgment.

Respectfully submitted,

KARL A. RACINE
Attorney General for the District of Columbia

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE
Solicitor General

CARL J. SCHIFFERLE
Deputy Solicitor General

MATTHEW E. MORRIS
Assistant Attorney General
Office of the Solicitor General

Office of the Attorney General
400 6th Street, NW, Suite 8100
Washington, D.C. 20001
(202) 724-6609
(202) 741-0649 (fax)
March 2022                          caroline.vanzile@dc.gov

On behalf of:

ROB BONTA
Attorney General
State of California
1300 I Street
Sacramento, CA 95814

KATHLEEN JENNINGS
Attorney General
State of Delaware
820 North French Street
Wilmington, DE 19801

BRIAN E. FROSH
Attorney General
State of Maryland
200 Saint Paul Place
Baltimore, MD 21202

KEITH ELLISON
Attorney General
State of Minnesota
102 State Capitol
75 Rev. Dr. Martin Luther King Jr. Blvd.
St. Paul, MN 55155

MATTHEW J. PLATKIN
Acting Attorney General
State of New Jersey
Richard J. Hughes Justice Complex
25 Market Street
Trenton, NJ 08625

LETITIA JAMES
Attorney General
State of New York
28 Liberty Street
New York, NY 10005

WILLIAM TONG
Attorney General
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106

AARON M. FREY
Attorney General
State of Maine
6 State House Station
Augusta, ME 04333

MAURA HEALEY
Attorney General
Commonwealth of Massachusetts
One Ashburton Place
Boston, MA 02108

AARON D. FORD
Attorney General
State of Nevada
100 North Carson Street
Carson City, NV 89701

HECTOR BALDERAS
Attorney General
State of New Mexico
408 Galisteo Street
Santa Fe, NM 87501

ELLEN F. ROSENBLUM
Attorney General
State of Oregon
1162 Court Street NE
Salem, OR 97301

PETER F. NERONHA
Attorney General
State of Rhode Island
150 South Main Street
Providence, RI 02903

ROBERT W. FERGUSON
Attorney General
State of Washington
1125 Washington Street SE
P.O. Box 40100
Olympia, WA 98504

THOMAS J. DONOVAN, JR.
Attorney General
State of Vermont
109 State Street
Montpelier, VT 05609

## CERTIFICATE OF SERVICE

I certify that on March 3, 2022, I electronically filed this brief with the Clerk of the Court of the United States Court of Appeals for the Seventh Circuit by using the appellate CM/ECF system.  Counsel of record for all parties are registered CM/ECF users and will be served by the appellate CM/ECF system.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE

## CERTIFICATE OF COMPLIANCE

1. I certify that this brief complies with the typeface and type style requirements of Federal Rule of Appellate Procedure 32(a)(5) and (6) and Circuit Rule 32(b) because it has been prepared in a proportionally spaced typeface using Microsoft Word 365 in Times New Roman 14 point.

2. I certify that this brief complies with the type volume limitations set forth in Circuit Rule 29, in that the text of the brief, including headings, footnotes, and quotations, but excluding the cover page, the table of contents, the table of authorities, the signature block, and this certificate and the certificate of service, contains 6,832 words.  In preparing this certificate, I relied on the word count of the Microsoft Word processing system used to prepare this brief.

/s/ Caroline S. Van Zile
CAROLINE S. VAN ZILE